**UNITED STATES of America,**
**Plaintiff,**

v.

**Zeinab TALEB–JEDI, Defendant.**

**No. 06 CR. 652 (BMC).**

United States District Court,
E.D. New York.

July 23, 2008.

Eileen M. Decker and Judith A. Heinz, Special Attorneys, United States Attorney's Office for the Central District of California, Kelly T. Currie, United States Attorney's Office for the Eastern District of New York, for Plaintiff.

Justine A. Harris of Federal Defenders of New York, Inc., Florian Miedel, for Defendant.

## MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

Defendant Zeinab Taleb–Jedi ("defendant") is charged in a one-count Indictment with providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Presently before the Court is defendant's motion to dismiss the Indictment.[1] For the reasons set forth below, the Court denies defendant's motion.

## BACKGROUND

### I. *Facts and Procedural History*

The following facts are taken from the Indictment and the record, including the

---

**1.** Defendant has additional motions pending before this Court, including a motion to suppress statements; a motion for a bill of particulars; and a motion for additional discovery. These motions will be decided by a separate Order.

various submissions of the parties in connection with this motion.[2]

Defendant was born on June 27, 1955 in Tehran, Iran and first came to the United States on a student visa in 1978. As a student, defendant became politically active and protested against the Iranian government. In 1987, defendant obtained her lawful residency status and was naturalized as a United States citizen on August 26, 1996. In response to a question on her application for naturalization asking her to list any present and past memberships or affiliations with organizations, associations or other groups in the United States or in any other place, defendant responded "none." This was a similar response to similar questions posed when defendant applied for asylum and lawful residency status.

According to the Government, defendant was the registered foreign agent for the People's Mojahedin Organization of Iran (the "PMOI")[3] in the United States from December 1995 to February 1996. The registration form describes her services as "press officer of the registrant, assisting in the dissemination of press releases and the furnishing of information to the media...." Relying on a 1993 Intelligence Research Paper from the Central Intelligence Agency, the District of Columbia Circuit (the "D.C. Circuit") found that the PMOI:

> is the largest and most active Iranian dissident group. Its primary goal is the overthrow of the Iranian Government, after which it would seek to establish a nontheocratic republic.... The [PMOI]'s history, marked by violence and terrorism, belies its claim to uphold democratic ideals. Formed in the early 1960s, it origins reflect both Marxist and Islamic influences, and its history is studded with anti-Western activity.

*People's Mojahedin Organization of Iran v. United States Dep't of State*, 182 F.3d 17, 20 (D.C.Cir.1999) ("*PMOI I*").[4] It is generally believed that the PMOI receives financial support and manpower from expatriate Iranians throughout the world. It has offices in Europe, North America, the Middle East and Australia. These offices are primarily responsible for collecting donations and for organizing activities. *Id.* at 21.

Defendant left the United States in August 1999 and traveled to a PMOI community in Iraq, known as Camp Ashraf. Ashraf operated as a base for the PMOI to conduct military operations against Iran and, as defendant maintains, it was primarily a location where it engaged in "legitimate political advocacy."

Following the United States' invasion of Iraq, United States military forces confiscated the PMOI's weapons at Ashraf and secured the exterior of the camp. The military transformed Ashraf into a detention facility. In February 2004, based on a cooperation agreement between the PMOI and United States forces, the military be-

---

**2.** In evaluating a motion to dismiss an indictment, a court must treat the allegations in the indictment as true. *See United States v. Velastegui*, 199 F.3d 590, 592 n. 2 (2d Cir.1999).

**3.** The PMOI is also known as the Mujahedin-e Khalq, the MEK, the MKO, the Organization of the People's Holy Warriors of Iran and the Sazeman-e Mujahedin-e Khalq-e Iran. The Court will refer to the organization as the PMOI.

**4.** Defendant paints a different picture of the type of activities the PMOI has engaged in during the course of its existence. According to defendant, the PMOI's "activities are designed to bring international attention to the human rights abuses of the Iranian regime, [and] educate the public about viable alternatives to the current Iranian government...."

gan to screen and interview residents of Ashraf.

The Federal Bureau of Investigation ("FBI") interviewed defendant twice while she was at Ashraf. Defendant signed a waiver of rights form at the first interview on March 2, 2004. Defendant was then interviewed again on March 15, 2004, and she declined to sign the same form. According to the Government, defendant admitted to being the registered foreign agent for the PMOI and that she was aware that the United States Secretary of State had designated the organization as a foreign terrorist organization. She told the interviewing agents that she is a supporter of the PMOI and the National Liberation Army of Iran (the "NLA").[5] She also informed the FBI that she taught English classes, translated documents and was assigned to the Political Department at Ashraf.

Defendant remained at Ashraf until March 30, 2006, when she left to return to the United States. Upon arrival at John F. Kennedy International Airport, defendant was arrested. On September 29, 2006, a federal grand jury in this district returned an indictment charging defendant with one count of providing material support and resources, including herself, to a terrorist organization. The Indictment covers the period of 1999 to 2006. The PMOI was designated as a foreign terrorist organization for this entire period.

II. *Statutory Framework*

On April 29, 1996, the Anti–Terrorism and Effective Death Penalty Act (the "AEDPA") was signed into law. Two sections of it are at issue in defendant's motion. Section 1189 of Title 8 empowers the Secretary of State to designate an organization as a "foreign terrorist organization" ("FTO"). 8 U.S.C. § 1189. Section 2339B of Title 18 makes it a crime for anyone to provide "material support" and resources to an FTO. 18 U.S.C. § 2339B.

Under § 1189, the Secretary may designate an organization an FTO if the Secretary finds: (1) that the organization is a foreign organization; (2) that the organization engages in terrorist activity; and (3) that the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.[6] 8 U.S.C. § 1189(a)(1)(A)-(C). The Secretary independently compiles an "administrative record" and makes "findings" based on this record. 8 U.S.C. § 1189(a)(3)(A). The Secretary also may consider "classified information" which is unavailable for review by public disclosure and even to the designated organization. 8 U.S.C. § 1189(a)(3)(B). *See also PMOI II*, 327 F.3d at 1239–41; *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 209 (D.C.Cir.2001) (*"NCRI "*). The Secretary is also not obligated to notify an organization that it is being considered for designation.[7]

---

**5.** The NLA is believed to be the military wing of the PMOI.

**6.** The D.C. Circuit, which has exclusive jurisdiction over reviewing these designations, has previously held that the third prong of this standard presents a nonjusticiable question. *People's Mojahedin Org. of Iran v. Department of State*, 327 F.3d 1238, 1240–41 (D.C.Cir. 2003) (*"PMOI II "*) ("Such questions concerning the foreign policy decisions of the Executive Branch present political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibilities and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.").

**7.** In *NCRI*, the D.C. Circuit held that several components of the designation process contained in 8 U.S.C. § 1189 are unconstitutional under the Fifth Amendment. It ruled that procedural due process requires that the Secretary "afford to the entities under consider-

Seven days before intending to designate an organization as an FTO, the Secretary must submit to key Congressional leaders and committee members a "classified communication" detailing the Secretary's findings. 8 U.S.C. § 1189(a)(2)(A)(i). The Secretary then publishes the designation in the Federal Register. 8 U.S.C. § 1189(a)(2)(A)(ii). The Secretary is not required to directly notify the designated organization. *See Humanitarian Law Project v. United States Dept. of Justice*, 352 F.3d 382, 386 (9th Cir.2003) ("*HLP II* ").[8]

An organization designated as an FTO that wishes to challenge its designation can only seek judicial review of the designation in the D.C. Circuit and must do so no later than 30 days after the Secretary publishes the designation in the Federal Register.[9] 8 U.S.C. § 1189(c)(1). The D.C. Circuit's review is limited to the administrative record, plus any classified information the Government chooses to submit *ex parte* for *in camera* review. 8 U.S.C. § 1189(c)(2). The D.C. Circuit will set aside an FTO designation only if it finds it to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;

(4) lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court; or (5) not in accord with the procedures required by law. 8 U.S.C. § 1189(c)(3)(A)-(E).

The consequences of this designation are severe and take effect as soon as the Secretary publishes the designation in the Federal Register. *See NCRI*, 251 F.3d at 196 (discussing the "dire" legal consequences). The consequences include the freezing of any assets which the organization has with any financial institution in the United States, 18 U.S.C. § 2339B(a)(2), and representatives and members of the FTO are forbidden from entering the United States. 8 U.S.C. § 1182(a)(3)(B)(i).

The consequences for an individual who provides material support or resources to an FTO are also quite severe. Section 2339B imposes criminal liability (up to life in prison, or possibly even the death penalty) upon "[w]hoever knowingly provides material support or resources to a foreign terrorist organization ..." 18 U.S.C. § 2339B(a)(1) (2000). "Material support or resources" was originally defined as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities,

ation notice that the designation is impending." 251 F.3d at 208. However, the D.C. Circuit developed an exception that "[u]pon an adequate showing to the court, the Secretary may provide this notice after the designation where earlier notification would impinge upon the security and other foreign policy goals of the United States." *Id.* The D.C. Circuit also held that due process requires that the Secretary must "afford to entities considered for imminent designation the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations." *Id.* at 209.

**8.** A group may only cease to be designated as an FTO if: (1) Congress blocks or revokes a designation, 8 U.S.C. § 1189(a)(5); (2) the Secretary revokes the designation based on a finding that changed circumstances or national security warrants such a revocation, 8 U.S.C. § 1189(a)(6)(A); or (3) the D.C. Circuit sets aside the designation under 8 U.S.C. § 1189(c)(3).

**9.** The PMOI has repeatedly challenged its designation in the D.C. Circuit, as discussed *infra*.

weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b).

On December 17, 2004, Congress passed the Intelligence Reform and Terrorism Prevention Act ("IRTPA") which amended the AEDPA. As amended, the term "material support or resources" was redefined to include:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b).

"Personnel" is currently defined to include "1 or more individuals" who "work under th[e] terrorist organization's direction or control or [who] organize, manage, supervise, or otherwise direct the operation of that organization." 18 U.S.C. § 2339B(h). "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction or control." Id.

Furthermore, IRTPA provides that the AEDPA's prohibition on providing "material support or resources" to a designated foreign terrorist organization includes a mens rea requirement. To violate the statute, a person who provides "material support or resources" to a designated organization must know that (1) "the organization is a designated terrorist organization," (2) "the organization has engaged or engages in terrorist activity," or that (3) "the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1).

A defendant in a criminal action under § 2339B is precluded from raising any issue concerning the validity of the organization's designation as an FTO during his or her criminal proceedings. 8 U.S.C. § 1189(a)(8).

### III. *The PMOI's Designation Challenges*

The PMOI, since first being designated a terrorist organization, has developed a litigation history in the D.C. Circuit. It was first designated an FTO in 1997. The D.C. Circuit upheld this designation because it was a "foreign entity without ... presence in this country" and thus "ha[d] no constitutional rights under the due process clause." *PMOI I*, 182 F.3d at 22. Therefore, the PMOI was not entitled to notice and a hearing. The D.C. Circuit also found the administrative record sufficient to establish that the PMOI "engages in terrorist activity." *Id.* at 24–25.

In the process of designating the PMOI a terrorist organization in 1999, the State Department determined that another organization, the National Council of Resistance of Iran (the "NCRI"), was an "alter ego" or "alias." *NCRI*, 251 F.3d at 197. Both organizations petitioned the D.C. Circuit for review of the Secretary's designation of them as foreign terrorist organizations. When reviewing the 1999 designation, the D.C. Circuit in 2001 held that since the NCRI had a presence in the United States and because it was an "alter ego" or "alias" of the PMOI, both organizations were entitled to "the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 200, 209 ("If the Secretary has the power to work those dire consequences [associated with designation] on an entity calling itself 'Organization A,' the Secretary must be able to

work the same consequences on the same entity while it calls itself 'Organization B.' "). The D.C. Circuit found that the designation violated due process because the Government did not provide the PMOI with notice or an opportunity to be heard. The D.C. Circuit remanded the 1999 designation to the State Department with instructions to give both organizations an opportunity "to file evidence in support of their allegations that they are not terrorist organizations." *Id.* at 209.

The PMOI then submitted evidence on its behalf. However, the D.C. Circuit believed this evidence showed that the PMOI was responsible for numerous assassinations of Iranian officials and mortar attacks on Iranian government installations. *PMOI II,* 327 F.3d at 1243. Upon reviewing this re-designation in 2003, the D.C. Circuit noted that any procedural due process error that might have existed was harmless because the PMOI had "effectively admitted" that it was a terrorist organization. *Id.*

### DISCUSSION

Defendant's motion to dismiss the Indictment presents a variety of different grounds discussed seriatim below.

### I. *Failure to State an Offense*

The single-count Indictment charges defendant with providing material support and resources, "including personnel (herself)," to the PMOI and its alleged aliases. Defendant argues that the Indictment should be dismissed pursuant to Fed. R.Crim.P. 7(c) and the Fifth and Sixth Amendments to the United States Constitution for failing to provide her with sufficient factual detail as to what "material support or resources" she provided to the PMOI. She claims that it fails to give her adequate notice of the charges and does not specify what was actually charged by the Grand Jury.

■ "The indictment ... must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). Courts have also "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Pirro,* 212 F.3d 86, 92 (2d Cir.2000) (quoting *United States v. Walsh,* 194 F.3d 37, 44 (2d Cir.1999)) (internal quotations and citations omitted).

■ The Indictment here meets the standard for specificity and provides defendant with adequate notice of the charges. It charges defendant with knowingly providing material support and resources, including personnel, to the PMOI and provides the approximate time span and locations of the offense. This is unlike the indictment in *United States v. Awan,* 459 F.Supp.2d 167 (E.D.N.Y.2006), which defendant cites as an example of a district court dismissing an indictment for failing to provide the requisite specificity. There, the district court concluded that the Government used an indictment "without specifying which of a variety of activities ... the defendant must defend against or which the grand jury considered." 459 F.Supp.2d at 175. Although the Government had indicated that it intended to prove certain activities such as the provision of currency and personnel, the *Awan*

court could not be sure that the grand jury had considered those categories since they were omitted from the indictment. When the Government then superseded the indictment to add these other categories, the district court found the superseding indictment to be sufficient. Here, in contrast, the term "personnel" is already included in the Indictment and therefore defendant can be certain that it was considered by the Grand Jury. Furthermore, at the hearing on this matter, the Government stated that it would only be relying on supplying personnel, and not any of the other prohibited conduct listed in the statute.

## II. *Challenging the FTO Designation*

Defendant argues that 8 U.S.C. § 1189(a)(8), which precludes her from raising at trial the question of whether the PMOI's designation as an FTO was correct and constitutional, creates several constitutional infirmities. First, defendant maintains that this provision violates her First Amendment rights under *McKinney v. Alabama*, 424 U.S. 669, 96 S.Ct. 1189, 47 L.Ed.2d 387 (1976). Second, defendant argues that she should also be permitted to challenge the designation as a matter of due process under the theory that the Fifth Amendment requires judicial review of an administrative proceeding that later plays a critical role in a criminal prosecution. Finally, defendant claims that prohibiting her from challenging the designation violates the nondelegation doctrine. Each of these constitutional challenges has been previously raised and rejected in various appellate and district courts. This Court agrees with both the reasoning and rulings of these prior decisions.

### A. *First Amendment*

■ Defendant argues that the PMOI is not a terrorist organization,[10] and that she is entitled under the First Amendment to be a member of the organization, to associate with it and to engage in advocacy on its behalf. Essentially her claim boils down to the following: (1) she has a First Amendment right to support and provide resources to organizations that are not terrorist; (2) the statutory scheme denies her the opportunity to challenge the FTO designation; and therefore (3) it deprives her of the First Amendment right to engage in protected conduct—membership, association and advocacy—with the PMOI, an organization she claims is non-terrorist oriented.

In *McKinney*, a newsstand proprietor argued that his First Amendment rights were violated when he was convicted under a statute that prohibited him from selling an obscene magazine. The obscenity of the magazine had been previously adjudicated in an *in rem* proceeding against the magazine, but not at the newsstand proprietor's criminal proceeding. Therefore, he was not a party to the *in rem* proceeding. The Supreme Court held that a decision in another proceeding could not conclusively determine the defendant's First Amendment rights to sell a magazine since he had no notice or opportunity to be heard in that proceeding.

Defendant maintains that like the newsstand proprietor, she should be entitled to litigate the FTO designation in her criminal case. She claims that precluding her from doing so violates the constitutionally required procedures regulating First Amendment rights as set forth in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

---

**10.** This argument would be a difficult one for defendant to make since the PMOI has admitted that it has engaged in terrorist activities by attacking various Iranian government organizations and assassinating Iranian officials. *See PMOI II*, 327 F.3d at 1243.

In *Freedman,* the Supreme Court struck down a Maryland censorship scheme in which a censorship board determined, absent an adversarial setting or outside input, whether films were obscene. The Supreme Court held that the statute was unconstitutional as a prior restraint on free speech. The Court found that the procedural scheme failed to provide adequate safeguards because (1) if the censor disapproved of a film, the exhibitor was required to assume the burden of instituting judicial proceedings to persuade a court that the film was protected expression; (2) once the censor board acted against a film, exhibition of it was prohibited pending judicial review; and (3) the statute did not provide any assurance of prompt judicial determination.[11]

Defendant's arguments fail, however, because the cases are not analogous. The material support statute does not prohibit speech, but rather it prohibits conduct in the form of material assistance. Defendant needs to look no further than the statute for this definition. Section 2339B(a)(1) explicitly provides, "knowingly provides *material support or resources* to a foreign terrorist organization." (emphasis added). Although the Indictment does not specify in great detail the type of conduct defendant engaged in, it does list it under the category of "personnel"—which does not include pure speech. *See United States v. Afshari,* 426 F.3d 1150, 1160 (9th

Cir.2005) ("What is at issue here is not anything close to pure speech. It is, rather, material support to foreign organizations that the United States has deemed, through a process defined by federal statute and including judicial review by the D.C. Circuit, a threat to our national security.").

Although many of the decisions addressing this issue were cases involving monetary support to organizations designated as FTOs, this distinction is not determinative. In these cases, the defendants primarily argued that they were seeking to express their political views by financially supporting organizations that the defendants alleged had mistakenly been designated as terrorist. *See e.g., id.* at 1160 (indictment charged the defendants with soliciting charitable contributions at an airport for the "Committee for Human Rights," and giving substantial sums of money and credit cards to the PMOI). The *Afshari* court held, as have other courts facing a similar fact pattern, that "the donation of money could properly be viewed by the government as more like the donation of bombs and ammunition than speech." *Id.; see also Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1133 (9th Cir.2000) ("*HLP I* ") ("What AEDPA prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the

---

**11.** The Supreme Court described the deficiencies in *Freedman:*

First, once the censor disapproves the film, the exhibitor must assume the burden of instituting judicial proceedings and of persuading the courts that the film is protected expression. Second, once the Board has acted against a film, exhibition is prohibited pending judicial review, however protracted. Under the statute, appellant could have been convicted if he had shown the film after unsuccessfully seeking a license, even though no court had ever ruled

on the obscenity of the film. Third, it is abundantly clear that the Maryland statute provides no assurance of prompt judicial determination. We hold, therefore, that appellant's conviction must be reversed. The Maryland scheme fails to provide adequate safeguards against undue inhibition of protected expression, and this renders the § 2 requirement of prior submission of films to the Board an invalid previous restraint.

380 U.S. at 59–60, 85 S.Ct. at 739–740.

weapons and explosives with which to carry out their grisly missions.").

The fact that the PMOI engages in at least some legitimate conduct is not particularly surprising or unique. A number of terrorist organizations engage in extensive social welfare programs. For example, Hezbollah, a terrorist organization that has been known to deploy suicide bombers, also runs hospitals, schools and even orphanages. One reason for this may be that these organizations use their humanitarian pursuits to garner support for their terrorist activity. *See* Rick Jervis and Andrea Stone, *From the Dust of War, a More Potent Hezbollah? Success on the Battlefield could Translate into Political Power for the Shiite Militia,* USA TODAY, Aug. 17, 2006 (explaining that Hezbollah's "charity work has created a zealous following"); Robin Wright, *Inside the Mind of Hezbollah,* WASH. POST, July 15, 2006 ("Hezbollah has not abandoned its extremist origins, even as it tries to establish conventional political legitimacy"). This example shows that conduct that is overtly non-terrorist, or even eleemosynary, can serve violent ends when performed on behalf of a terrorist organization.

Most of defendant's argument turns on whether what she is actually being charged with constitutes speech or conduct. The question here is concededly closer than in the monetary contribution cases, where courts have held that a less rigorous standard of review under the First Amendment is applied to monetary contributions than to pure speech. *See McConnell v. Federal Election Com'n,* 540 U.S. 93, 137, 124 S.Ct. 619, 656–57, 157

L.Ed.2d 491 (2003); *Afshari,* 426 F.3d at 1161. However, according to the Government, what is at issue here is not just the expression of viewpoints. The Government contends that defendant was part of a leadership council for the PMOI and may have made important decisions on behalf of the organization.

Although § 2339B "does not prohibit mere association", *United States v. Hammoud,* 381 F.3d 316, 329 (4th Cir.2004), *vacated on other grounds,* 543 U.S. 1097, 125 S.Ct. 1051, 160 L.Ed.2d 997 (2005), *reinstated in part,* 405 F.3d 1034 (4th Cir. 2005), defendant is not being charged with *mere association.* Mere association is different than working or assisting in the operation of a terrorist organization. There is no First Amendment right to facilitate terrorism by working under the organization's direction or control or by managing, supervising or directing the operation of a terrorist organization. *See* 18 U.S.C. § 2339B(h). Although the connection may not be as direct, the provision of personnel, like the provision of money, acts to free up others in a terrorist organization to engage in violence and other acts of terrorism. There is a fungibility to service for a terrorist organization just like there is fungibility to the funding of a terrorist organization. However, should the Government not deliver on its representation of what the evidence will show, and the proof at trial shows mere association, the Government's case may not be allowed to go to the jury or any guilty verdict based on mere association may be set aside.[12]

Another distinction courts have made, and one with which this Court concurs,

---

**12.** Some of the Government's arguments overstate the permissible reach of the definition of material support under § 2339B. Numerous cases have held that advocacy, association and membership are not actionable under this statute. *See Afshari,* 426 F.3d at 1161 ("Defendants are entitled under the First Amendment to publish articles arguing

that the MEK is not really a terrorist organization"); *Boim v. Quranic Literacy Inst. and Holy Land Foundation For Relief And Development,* 291 F.3d 1000, 1026–27 (7th Cir. 2002) (finding that the defendants "may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Ha-

regards the deference due the Executive Branch in the area of national security.[13] This deference distinguishes *McKinney* and *Freedman* from the situation at hand—the provision of material assistance to an FTO. *See Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 3038, 82 L.Ed.2d 171 (1984) ("Matters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.") (internal quotations omitted); *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (rejecting due process challenge to the Secretary of State's refusal to validate passports of United States citizens to travel to Cuba). The interest in protecting the Nation from assisting in supplying FTOs the means and manpower to engage in terrorism is one that all courts when addressing this issue must consider. *See HLP I*, 205 F.3d at 1136 ("[W]e must allow the political branches wide latitude in selecting the means to bring about the desired goal" of "preventing the United States from being used as a base for terrorist fundraising.").

Therefore, defendant's inability to challenge the validity of the designation under § 1189(a)(8) does not deprive her of her First Amendment constitutional rights.

### B. Due Process, Fifth Amendment

■ Defendant argues that the Fifth Amendment's Due Process Clause entitles her to challenge the PMOI's FTO designation as a predicate finding upon which the Indictment rests. Specifically, she maintains that (1) the designation procedures do not provide for meaningful review and, therefore, violate due process; and (2) that she has a constitutionally protected right to challenge the FTO designation because it is a predicate to a defense in her criminal action.

Defendant claims that § 1189 violates due process because the designated organization does not receive notice of the Secretary's determination and because the designated organization does not receive any meaningful judicial review. This argument is untenable because defendant does not have standing to challenge the statute on the ground that it failed to provide due process to a third party—the PMOI—that is not part of these proceedings. As the court in *United States v. Sattar* stated:

> The designation of [the Islamic Group] as an FTO had no effect on the defendants. While the defendants can challenge the allegation that they violated § 2339B by providing material support to an FTO or could contest that IG was, in fact, designated as an FTO, they cannot assert the due process claims of the FTO and challenge the underlying designation. The element at issue in this case is simply whether IG was designated as an FTO, and the defendants there-

mas" and that "Congress did not purport to criminalize membership in a terrorist organization or espousing the organization's views"); *HLP I*, 205 F.3d at 1133 ("The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. Plaintiffs are even free to praise the groups for using terrorism as a means of achieving their ends."); *United States v. Paracha*, No. 03 CR. 1197, 2006 WL 12768, *28

(S.D.N.Y. Jan. 3, 2006) ("By criminalizing the conduct of providing material support to any organization that is properly designated a foreign terrorist organization, and not the mere association with those organizations, the statute properly focuses on the personal action of the individual.").

**13.** This issue is discussed in more detail in subsection (c).

after knowingly provided, or conspired to provide, material support or assistance to it, not whether the Secretary of State correctly designated IG as an FTO. 272 F.Supp.2d 348, 364–65 (S.D.N.Y.2003) (noting that litigants lack standing to challenge a statute "solely on the ground that it failed to provide due process to third parties not before the court") (internal citation and quotation omitted).

Furthermore, defendant is incorrect that the PMOI was denied a meaningful opportunity to challenge this designation. "The AEDPA does not grant the Secretary unfettered discretion in designating the groups to which giving material support is prohibited." *HLP I*, 205 F.3d at 1137. The AEDPA lays out specific steps for the Secretary to follow and "the Secretary must have reasonable grounds to believe that an organization has engaged in terrorist acts-assassinations, bombings, hostage-taking and the like-before she can place it on the list." *Id.* (citing 8 U.S.C. § 1182(a)(3)). The statute also provides an opportunity for the organization to challenge this designation before the D.C. Circuit, which the PMOI, unlike many other organizations, consistently did. These procedures are sufficient to ensure that constitutional rights are protected. *See id.* ("This standard is sufficiently precise to satisfy constitutional concerns.").

Defendant points to the fact that the D.C. Circuit's ruling in *NCRI* found that the 1999 designation of the PMOI as an FTO violated due process because the Government did not provide the organization with notice or an opportunity to be heard. However, this argument also fails for two reasons. First, after the D.C. Circuit remanded the designation to the State Department with the instructions to provide the designated organizations an opportunity "to file evidence in support of their allegations that they are not terrorist organizations", 251 F.3d at 209, the PMOI admitted to numerous terrorist attacks. Upon review, the D.C. Circuit upheld the designation and concluded that if any procedural due process violation had occurred, it would have been harmless. *PMOI II*, 327 F.3d at 1244 ("Even if the record supported a finding of violation of due process, such a violation would be harmless as the unaffected portion of the record is ample to support the determination made."). Second, even if there was a due process violation, it applied only to the PMOI. Defendant did not suffer any deprivation of due process on the organization's behalf.

Defendant additionally advances the related argument that § 2339B violates her due process rights because § 1189(a)(8) prohibits her from collaterally attacking the designation of the PMOI. Defendant claims that this statutory scheme violates her Fifth Amendment right to due process and her Sixth Amendment right to a jury trial by depriving her of a jury determination of guilt on every element of the charged offense. Defendant is correct that under § 1189(a)(8) "a defendant in a criminal action . . . shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing." 8 U.S.C. § 1189(a)(8). However, this Court agrees with the Fourth and Ninth Circuits and a number of other district courts addressing this issue which have held that the statutory scheme does not violate either defendant's Fifth or Sixth Amendment rights.

Some courts have noted that when drafting these statutes, Congress recognized that some defendants might claim that "one man's terrorist is another man's freedom fighter." *See Afshari*, 426 F.3d at 1155; *United States v. Marzook*, 383

F.Supp.2d 1056, 1072 (N.D.Ill.2005). Nevertheless, Congress delegated the authority to make such distinctions to the Secretary of State and specifically took this policymaking "out of the hands of United States Attorneys and juries." *Afshari*, 426 F.3d at 1155. Obvious reasons exist as to why Congress made this decision.[14]

Of course, it is axiomatic that Congressional policy determinations do not ensure compliance with constitutional requirements. The Supreme Court has held that the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 509–10, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995). The statutes at issue do not violate this principle. This is because "Congress has provided that the *fact* of an organization's designation as an FTO is an element of § 2339B, but the *validity* of the designation is not." *Hammoud*, 381 F.3d at 331 (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 85, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986), for the proposition that the "legislature's definition of the elements of the offense is usually dispositive"); *see also Afshari*, 426 F.3d at 1155–56. Therefore, under § 2339B, if defendant provided material support to the PMOI, an organization that has been designated an FTO under § 1189, she meets the first element of the offense, and it is irrelevant whether the designation is valid or not.

Despite the holding in *Hammoud* and the fact that several other courts have followed it, defendant relies on *United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), to

contest it. In that case, the Supreme Court found that two aliens prosecuted under 8 U.S.C. § 1326 for illegal re-entry following deportation were allowed to argue the invalidity of the underlying deportation order as a defense to the criminal proceeding. The Court reached this conclusion even though there was no congressional intent to allow defendants to challenge deportation orders in § 1326 proceedings. *Id.* at 834–37, 107 S.Ct. at 2153–54.

The Court in *Mendoza–Lopez* held that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." *Id.* at 837–38, 107 S.Ct. at 2155. As other courts have pointed out, "nothing in *Mendoza–Lopez* appears to require that this review be had by the defendant in the subsequent criminal proceeding." *Afshari*, 426 F.3d at 1158 (noting that there just needs to be some meaningful review of the administrative proceeding). Furthermore, unlike the situation here, the opportunity to seek review in *Mendoza–Lopez* could only be in the hands of the defendant because it was that defendant's rights at issue in the administrative hearing. However, as noted above, defendant's rights were not violated in the proceeding before the D.C. Circuit. The FTO designation was only against the PMOI, and not against this defendant. In addition, § 1189 allows for organizations, like the PMOI, to seek review of the designation, and there is no dispute that the PMOI regularly took advantage of such review. The decision in *Mendoza–Lopez* does not compel another review of the

---

**14.** *See Sattar,* 272 F.Supp.2d at 367 ("Centralized review under the statute is important because FTO designations have significant foreign relations implications that Congress could reasonably conclude should be resolved by a court that is able to develop a unified body of relevant law.").

predicate designation by courts adjudicating § 2339B criminal cases. *Id.* at 1159.

As the Ninth Circuit has previously noted, this case "is analogous to one by a defendant in a drug possession case that his conviction cannot stand because no specific showing has been made that the drug is a threat to society.... [A] showing that the drug possessed by the individual defendant has a 'detrimental effect on the general welfare' [is not] an element of the offense." *United States v. Mandel*, 914 F.2d 1215 n. 11 (9th Cir.1990) (quoting *Spawr Optical Research, Inc. v. Baldrige*, 649 F.Supp. 1366, 1372 n. 10 (D.D.C.1986)). The point that the Ninth Circuit was trying to make in *Mandel* and in other cases following it is that Congress and local legislatures have the power to make certain determinations, such as that certain drugs pose a threat to public health, safety and the general welfare. However, a defendant in a criminal case cannot contest this element by showing that the drug in question does not have a detrimental effect on health or safety, and thereby this issue does not become an element of the offense. Similarly, the only element here that the Government needs to prove is that the PMOI was designated as an FTO during the time period covered in the Indictment.

Therefore, defendant's inability to challenge the validity of the designation under § 1189(a)(8) does not deprive her of her Fifth and Sixth Amendment rights.

### C. Nondelegation Doctrine

█ Defendant argues that § 1189 violates the nondelegation doctrine because the designation of the PMOI as an FTO is not subject to judicial review. This argument does not have much merit because an FTO designation *is* subject to judicial review—the decision may be challenged by the organization itself. *See* 8 U.S.C. § 1189(c). Other courts have addressed and disposed of this argument in other contexts. *See Hammoud*, 381 F.3d at 331; *United States v. Bozarov*, 974 F.2d 1037, 1041–45 (9th Cir.1992) (no violation of the nondelegation doctrine when Congress delegated listing on the Commodity Control List to Secretary of Commerce under the Export Administration Act).

Furthermore, to the extent that there is any argument that it is unconstitutional for Congress to delegate the authority to make this decision to the Executive Branch, the Court holds that it is constitutionally permissible. Congress has established detailed procedures to designate organizations as FTOs and it retains the power to revoke such a designation when made. In addition, the organization has the ability to challenge the designation before the D.C. Circuit.

Defendant directs this Court to a recent decision by the British Court of Appeal affirming the removal of the PMOI from the United Kingdom's terrorism list. The system the United Kingdom uses to designate organizations as proscribed under their Terrorism Act is similar to the one used in this country. The action there was brought following three refusals by the Secretary of State for the Home Department to remove the PMOI from the terrorism list. The respondents then appealed the last refusal to the Prescribed Organizations Appeals Commission ("POAC"), which then determined that the PMOI was not an organization concerned in terrorism. The British Court of Appeal reviewed the POAC's decision and concurred that the organization's means and methods have changed since the time that it was initially designated. *See In the Matter of the People's Mojahadeen Organisation of Iran*, 2008 EWCA Civ 443 (May 7, 2008) ("[T]o the extent that the PMOI has retained networks and supporters inside Iran, since, at the latest, 2002,

they have been directed to social protest, finance and intelligence gathering activities which would not fall within the definition of 'terrorism' "). The parties in that case followed the correct procedures to challenge the designation. Like the United Kingdom, we also have ways in which this designation can be challenged. However, this Court is not one of those appropriate channels.

Defendant's position that the PMOI should not be designated as an FTO because it has not engaged in violent acts for a number of years thus has no bearing on this decision. Whether or not the PMOI's means and methods have changed and the validity of the designation is still not for this Court or for a jury to decide. As the Ninth Circuit in *Afshari* explained:

> The sometimes subtle analysis of a foreign organization's political program to determine whether it is indeed a terrorist threat to the United States is particularly within the expertise of the State Department and the Executive Branch. Juries could not make reliable determinations without extensive foreign policy education and the disclosure of classified materials. Nor is it appropriate for a jury in a criminal case to make foreign policy decisions for the United States. Leaving the determination of whether a group is a "foreign terrorist organization" to the Executive Branch, coupled with the procedural protections and judicial review afforded by the statute, is both a reasonable and a constitutional way to make such determinations. The Constitution does not forbid Congress from requiring individuals, whether they agree with the Executive Branch determination or not, to refrain from furnishing material assistance to designated

terrorist organizations during the period of designation.

426 F.3d at 1162 (internal citations omitted).

Therefore, the designation scheme does not violate the nondelegation doctrine.

### III. *Specific Intent*

Defendant argues that for the Court to support a conviction under § 2339B, the Government must prove that defendant acted with the specific intent for her provision of material support to further the terrorist activities of the PMOI. In other words, according to defendant, it is not enough for her to specifically intend to further the PMOI's general goals; she must specifically intend to further its terrorist aims.

██ Defendant contends that a reading of the statute without a specific intent requirement violates both the First Amendment and the Fifth Amendment's Due Process Clause. Defendant therefore claims that in order to avoid impermissibly criminalizing potentially innocent conduct, the Court must construe § 2339B as requiring proof that defendant knew that she was providing material support or resources to a designated FTO or an organization that she knew engaged in terrorist acts *and* that she specifically intended for this support to aid the organization in its terrorist activities.

### A. *First Amendment*

Defendant argues that § 2339B violates her freedom of association under the Freedom of Speech and Freedom of Association clauses of the First Amendment because the statute lacks a specific intent element and thereby imposes guilt by association.[15]

---

15. The First Amendment provides that Congress shall "make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. Const. amend. I.

She claims that the statute impermissibly criminalizes mere membership in, or association with, the PMOI, a designated FTO. Defendant therefore maintains that § 2339B should be subject to strict scrutiny review because it is aimed at interfering with an expressive component of conduct.

■ It is well settled that the First Amendment "restricts the ability of the State to impose liability on an individual solely because of his association with another." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918–19, 102 S.Ct. 3409, 3428–29, 73 L.Ed.2d 1215 (1982). The Supreme Court has stated that a "blanket prohibition of association with a group having both legal and illegal aims ... [would pose] a real danger that legitimate political expression or association would be impaired." *Scales v. United States*, 367 U.S. 203, 229, 81 S.Ct. 1469, 1486, 6 L.Ed.2d 782 (1961) (finding a statute unconstitutional that made it unlawful to be a knowing member of an organization that advocated the violent overthrow of the United States because membership in an organization engaged in illegal advocacy is insufficient to satisfy personal guilt). Numerous courts have held that mere membership, without more, in an organization that has both legal and illegal goals may not be punished under the First Amendment. *See e.g., Hammoud*, 381 F.3d at 328. Consequently, any statute seeking to prohibit association alone "must require a showing that the defendant specifically intended to further the organization's unlawful goals." *Id.* (citing *Elfbrandt v. Russell*, 384 U.S. 11, 15–16, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966)); *see also Melzer v. Board of Education of City School Dist. of*

*City of New York*, 336 F.3d 185, 198 (2d Cir.2003) ("Even were it shown on this record ... that some of [the organization]'s members engage in illegality, or that the organization's aims are in fact illegal, [an individual] could not be punished absent clear proof ... that he knew of such illegal aims and specifically intended to accomplish them."); *Boim*, 291 F.3d at 1022 ("[I]n order to impose liability on an individual for association with a group, it is necessary to establish that the group possessed unlawful goals and that the individual held a specific intent to further those illegal aims.").

Defendant concedes that the plain language of § 2339B clearly does not require a defendant to have a specific intent, and Congress' decision to include an explicit *mens rea* requirement in § 2339A is evidence that it deliberately omitted a specific intent requirement for § 2339B.[16] Congress is capable of and knows how to include a specific intent requirement when it so desires, and courts should not infer a different intent than what Congress specifically provides for in a statute. *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952) (finding that courts "should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute"); *see also Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes"). The legislative history of the statute also shows that Congress was concerned that "foreign organizations that engage in ter-

---

**16.** 18 U.S.C. § 2339A(a) imposes criminal liability upon one who "provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out" terrorist activities.

rorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA, Pub.L. 104–132, § 301(a)(7). In addition, when Congress amended § 2339B in 2004, it only added the requirement that a defendant know that the organization to which she is giving material support or resources is an FTO or that it engages or has engaged in terrorist activities.[17]

Since it is evident that § 2339B does not contain a specific intent requirement, defendant argues that the statute unconstitutionally infringes upon her First Amendment right of association, and urges this Court to imply a specific intent requirement if it does not strike down the statute entirely. The premise of this argument is that § 2339B criminalizes mere membership in or association with a terrorist organization. However, defendant is mistaken because § 2339B prohibits the *conduct* of providing material support and resources to an FTO. *See PMOI II*, 327 F.3d at 1244–45 ("It is conduct and not communication that the statute controls."). Therefore, as the court in *United States v. Warsame*, 537 F.Supp.2d 1005, 1014 (D.Minn.2008), found, § 2339B is inherently different from any laws that impose liability on a defendant "solely because of his association with another." (quoting *Claiborne Hardware*, 458 U.S. at 918–19, 102 S.Ct. at 3428) (internal quotation marks omitted); *see also Healy v. James*, 408 U.S. 169, 192, 92 S.Ct. 2338, 2351, 33 L.Ed.2d 266 (1972) (finding that "the critical line for First Amendment purposes must be drawn between advocacy, which is

entitled to full protection, and action, which is not"). The Court concurs with each of the Courts of Appeals that has considered this issue and similarly finds that the statute does not prohibit mere membership and does not punish individuals for advocating or sympathizing with the goals of organizations like the PMOI. *See Hammoud*, 381 F.3d at 329 (4th Cir. 2004); *HLP I*, 205 F.3d at 1135–36 (9th Cir.2000); *PMOI II*, 327 F.3d at 1244 (D.C.Cir.2003); *Boim*, 291 F.3d at 1026 (7th Cir.2002).

The argument defendant puts forth has been regularly rejected in a number of appellate decisions. The Ninth Circuit, one of the courts to reject a similar First Amendment challenge to § 2339B, stated:

Plaintiffs try hard to characterize the statute as imposing guilt by association, which would make it unconstitutional under cases such as *Claiborne Hardware*. But *Claiborne Hardware* and similar cases address situations where people are punished "by reason of association alone,"—in other words, merely for membership in a group or for espousing its views. AEDPA authorizes no such thing: The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. Plaintiffs are even free to praise the groups for using terrorism as a means of achieving their ends. What AEDPA prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly mis-

---

**17.** IRTPA clearly adopted the Ninth Circuit's decision in *HLP II*, which held that § 2339B requires that a defendant know either that the organization is an FTO, or that the organization engaged in terrorist activities. 352 F.3d at 400. At the time there was a different decision, *United States v. Al-Arian*, 329

F.Supp.2d 1294, 1299–1300, 1303–05 (M.D.Fla.2004), which had construed § 2339B as requiring a specific intent to further an organization's terrorist activities. By passing IRTPA Congress implicitly rejected that district court's construction of § 2339B.

sions. Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives.

*HLP I,* 205 F.3d at 1133 (internal citation omitted).

The major distinction between the cases decided by the Courts of Appeals noted above and the one before this Court is that those cases involved more ostensible conduct, such as the provision of currency to FTOs. Other district court cases have also involved facts that are arguably more serious and conduct that poses a greater threat to national security than what is at issue here. Because the Government is seeking to prosecute defendant on the basis of personnel alone, defendant maintains this category is different.

Defendant essentially contends that this Court does not need to disagree with these other decisions because this case can be distinguished on the facts. Unlike the provision of currency, defendant has control over her person and can limit and direct the support that she provides so that it does not further terrorist aims. In addition, defendant argues that the personnel she allegedly provided amounts to nothing more than mere membership, mere advocacy. She points to the evidence that the Government has put forth at this point in the case—that defendant attended meetings, taught English, translated documents, chanted certain slogans and belonged to the PMOI's Political Department and leadership council, the *Shoura*—to illustrate that all of this "conduct" is protected by the First Amendment.

Defendant is incorrect in contending that all of this conduct is pure membership and advocacy protected by the First Amendment. Although a person may have the right to independently advocate the goals of an FTO, as Congress provided for in its definition of personnel, and even to be a member of an organization, a defendant does *not* have the right to act as an employee of such an organization and engage in work, no matter how apparently benign. It is work under the terrorist organization's direction or control or by a defendant to organize, manage, supervise, or direct the operation of a terrorist operation that the AEDPA seeks to prohibit and that is not constitutionally protected.

Defendant's argument that by providing her personnel she is not "provid[ing] resources with which terrorists can buy weapons and explosives," *HLP I,* 205 F.3d at 1133, also fails. In fact, her work as a member of the PMOI's Political Department and her position in the *Shoura* may directly impact the organization's ability to engage in terrorist activities. As an "employee" working in that area, she may be freeing up or enabling another person to take part in something far more nefarious than the work she allegedly did guiding the organization.[18]

Defendant erroneously contends that the Court should apply strict scrutiny to § 2339B; rather, the appropriate standard is found in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which applies when a facially neutral statute restricts some expressive conduct. Section 2339B's prohibition on providing personnel to terrorist organizations

---

**18.** It is unclear at this point what exactly defendant did on behalf of the organization. However, taking an active role in the PMOI's political decisions or engaging in activities as a member of the *Shoura* amount to more than mere advocacy and membership and clearly fall under the prohibited personnel rubric.

Nevertheless, the Government will need to demonstrate that what she engaged in actually *was* conduct and not just participation in the organization via membership and chanting at meetings, which is allegedly captured on videotapes produced in discovery.

is directed not at speech but rather at conduct, thereby invoking this intermediate scrutiny standard. The statute would therefore be valid

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679.

Section 2339B satisfies *O'Brien*'s four elements. First, § 2339B is within the Government's constitutional power to regulate interactions between citizens and foreign entities. *Hammoud,* 381 F.3d at 329 (citing *Regan v. Wald,* 468 U.S. 222, 244, 104 S.Ct. 3026, 3039, 82 L.Ed.2d 171 (1984)) [19]. Second, the Government has a substantial interest in preventing the spread of international terrorism. *Id.* (citing *HLP I,* 205 F.3d at 1135). Third, the Government's interest in preventing international terrorism is unrelated to the suppression of free expression. *Id.* Defendant remains free to sympathize with or advocate in favor of the PMOI. Finally, any incidental restrictions on defendant's freedom of expression are no greater than necessary to further the interest because mere membership and association are not prohibited under § 2339B.

The Court therefore finds that § 2339B does not violate defendant's First Amendment rights. As a result, defendant's motion to dismiss on this ground is denied.

**B. Due Process and Scienter**

■ Defendant next argues that § 2339B violates the Fifth Amendment's Due Process Clause by permitting criminal liability to attach in the absence of personal guilt.[20] Defendant maintains that the Court should read a specific intent requirement into the statute. Defendant claims that § 2339B violates her due process rights because the statute does not include a specific intent requirement to further terrorist activities. According to *Scales,* a statute violates due process if it "impermissibly imputes guilt to an individual merely on the basis of his associations and sympathies, rather than because of some concrete, personal involvement in criminal conduct." 367 U.S. at 220, 81 S.Ct. at 1481–82. The Supreme Court has found that:

> In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ..., that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment.

*Id.* at 224–25, 81 S.Ct. at 1484.

The Supreme Court required this heightened *scienter* in *Scales* because without it, the Act in question could have been interpreted as criminalizing membership in an organization that engages in illegal activities. However, as this Court has already noted, that is not the case

---

**19.** The Supreme Court in *Regan* held that restrictions on travel to Cuba do not violate the Due Process Clause.

**20.** This argument is closely connected to the previous discussion on the First Amendment. However, the Fifth Amendment point is concerned with the issue of status—that criminal

penalties not be "imposed on persons who are related by status or conduct to a proscribed organization," while the First Amendment prohibits punishment by reason of membership or association alone. *HLP II,* 352 F.3d at 394–95.

here. Section 2339B does not criminalize mere membership or association with a designated FTO. On the other hand, the statute does prohibit the conduct of providing material support or resources to these organizations. This provision of support amounts to what the Court in *Scales* referred to as "concrete, personal involvement in criminal conduct," and not just membership or association alone. Therefore, the need and reasons for a heightened *scienter* requirement in *Scales* do not apply to cases brought pursuant to § 2339B.

Defendant cites two cases, *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), and *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), where the Supreme Court read a *mens rea* requirement into federal criminal statutes. However, these cases can easily be distinguished from the case before this Court and neither supports a position to dispense with Congress' clear intent to omit this heightened standard.

In *Staples*, the Supreme Court interpreted the National Firearms Act, which criminalized the possession of an unregistered firearm, to have a *mens rea* element. The Court held that a defendant must know that the gun he possesses is actually a firearm in order to be convicted. *Staples*, 511 U.S. at 619, 114 S.Ct. at 1804. In reaching this conclusion, the Court noted that "we have long recognized that determining the mental state required for commission of a federal crime requires construction of the statute and ... inference of the intent of Congress." *Id.* at 605, 114 S.Ct. at 1796–97 (internal quotations omitted). Finding that the section of that statute was silent as to any *scienter* requirement, the Court construed the statute to include *mens rea*, and noted that the statute's harsh penalties further supported such a reading. Nevertheless, this holding was "a narrow one," and the lack of Congressional intent to dispense with *mens rea* was a crucial factor the Court considered. *Id.* at 619–620, 114 S.Ct. at 1804 ("We note only that our holding depends critically on our view that if Congress had intended to make outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapons, and to subject them to lengthy prison terms, it would have spoken more clearly to that effect.").

The Supreme Court then decided *X–Citement Video*. The case dealt with the Protection of Children Against Sexual Exploitation Act, which prohibited the interstate transportation of visual depictions of minors engaged in sexually explicit conduct. The Supreme Court interpreted the Act to require that a defendant know that the persons in the depictions were minors. In reaching this holding, the Supreme Court found that both the statutory construction and legislative history could support a *scienter* requirement. *X–Citement Video*, 513 U.S. at 69–72, 115 S.Ct. at 467–69. Like in *Staples*, the Supreme Court acknowledged Congress' authority to draft statutes without a *mens rea* element, and found that courts could interpret statutes to have this requirement "so long as such a reading is not plainly contrary to the intent of Congress." *Id.* at 78, 115 S.Ct. at 472.[21]

21. It should further be noted that in both *Staples* and *X–Citement Video*, the Supreme Court did not construe the statutes to have a specific intent requirement. The Court only interpreted a *mens rea* requiring that a defendant under either Act have knowledge of the prohibited conduct. *See Humanitarian Law Project v. Gonzales*, 380 F.Supp.2d 1134, 1145 n. 8 (C.D.Cal.2005) (discussing these cases).

As discussed above, Congress' intent regarding the *scienter* required for violating § 2339B is clear and unambiguous. Although the statutory language of § 2339A includes an explicit specific intent requirement to further illegal activities, such a requirement is clearly missing from the language of § 2339B. Second, the legislative history indicates that Congress enacted § 2339B in order to close a loophole left by § 2339A. Congress was concerned that FTOs would raise funds "under the cloak of a humanitarian or charitable exercise," H.R. Rep. 104–383, at *43 (1995), and made the oft-repeated specific finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA, Pub.L. 104–132, § 301(a)(7). Finally, the 2004 IRTPA amendment dispenses with any argument that Congress accidentally omitted a specific intent requirement.

Furthermore, although § 2339B does not require heightened *scienter*, it does provide for some showing of *scienter* that is sufficient to meet the due process standard of personal guilt. Punishment only attaches when a donor provides material support to an FTO, knowing either that the organization was a designated FTO, or that it engaged or engages in terrorist activity or terrorism. 18 U.S.C. § 2339B(a)(1). A defendant thus makes a knowledgeable choice to violate the law; the situation cannot exist where a defendant inadvertently stumbles into a violation. Congress deemed this knowledge requirement to be sufficient because the statute is aimed at "stopping aid to terrorist groups," *HLP I*, 205 F.3d at 1135, under the belief that any contribution to such organizations allows these terrorist campaigns to continue.

Only one district court that addressed this issue has concluded that the knowledge *scienter* is constitutionally insufficient. In *United States v. Al–Arian*, 308 F.Supp.2d 1322, 1339, *reconsideration denied*, 329 F.Supp.2d 1294 (M.D.Fla.2004), the district court interpreted § 2339B to require that the defendant specifically intend to further terrorist activity. The *Al–Arian* court was concerned that innocent conduct could be criminalized under § 2339B, but no other court that has reached this issue has adopted its reasoning. *See, e.g., Warsame*, 537 F.Supp.2d at 1021–22; *United States v. Paracha*, No. 03 CR. 1197, 2006 WL 12768, *25 (S.D.N.Y. Jan. 3, 2006); *Marzook*, 383 F.Supp.2d 1056, 1070 (N.D.Ill.2005).[22] Like these other courts, this Court finds that a requirement for specific intent in this statute is unnecessary and that the knowing *scienter* requirement is more than sufficient to satisfy due process.

Therefore, the Court rejects defendant's argument that § 2339B imposes liability in the absence of personal guilt and thereby denies defendant due process under the

---

**22.** Some courts have addressed the hypotheticals the *Al–Arian* court described as potential conduct that could be criminalized under the statute. However, as the *Warsame* court pointed out, these examples "involve the provision of support to an individual who happens to be a member of a FTO. Under the plain language of § 2339B, however, the government must prove that the defendant 'knowingly provides material support or resources to a foreign terrorist *organization*,' rather than to individuals who happen to be FTO members." 537 F.Supp.2d at 1022 (citing *Paracha*, 2006 WL 12768, at *29–30) (emphasis added). Therefore, this type of support to an individual member might be insufficient, and the Government must prove that a defendant knew that the intended recipient of the contribution was a designated FTO, or an organization that has engaged or engages in terrorist activity. *Id.*

Fifth Amendment. The Court will not read such a requirement into the statute.

## IV. *Vagueness*

 Defendant argues that § 2339B is impermissibly vague as to the term "personnel", both in its pre and post-IRTPA form. The "void for vagueness" doctrine is founded upon the Fifth Amendment guarantee of due process. The doctrine serves two goals. The first goal is to provide fair notice to persons of ordinary intelligence and the second aim is to provide standards to law enforcement and courts in order to discourage arbitrary and discriminatory enforcement. *See Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) ("[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."). The Supreme Court has noted that "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine-the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender,* 461 U.S. at 357–58, 103 S.Ct. at 1858 (quoting *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1247–48, 39 L.Ed.2d 605 (1974)).

 Although this doctrine is founded on the Fifth Amendment guarantee of due process, vagueness "is particularly troubling when First Amendment rights are involved" and the "doctrine demands a greater degree of specificity [when First Amendment rights are potentially implicated] than in other contexts." *Farrell v. Burke,* 449 F.3d 470, 485 (2d Cir.2006) (internal citations and quotations omitted); *see also Grayned v. City of Rockford,* 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (where a law "abut(s) upon sensitive areas of basic First Amendment freedoms [and] operates to inhibit the exercise of (those) freedoms" which would lead people to "steer far wider of the unlawful zone," it may be void-for-vagueness) (internal citations and quotations omitted). A party may challenge a statute on vagueness grounds by arguing either that the statute is vague as applied to the relevant conduct at issue in the case or that the statute is facially vague. *Farrell,* 449 F.3d at 485.

 In an as-applied vagueness challenge, a party who has notice of the criminality of her own conduct from the challenged statute may not attack it by arguing that the statute does not give fair warning to other conduct not at issue. *See Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). As to facial vagueness challenges, courts generally uphold a statute unless it is "impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). However, if a law implicates constitutional rights, courts will apply a more stringent facial vagueness test. *Id.* at 499, 102 S.Ct. at 1193–94. When a law implicates the First Amendment, facial invalidation is appropriate if the law reaches a substantial amount of protected conduct, even if the law is not vague in all its applications. *Id.* at 495–496, 102 S.Ct. at 1191.

 Courts should evaluate as-applied challenges before turning to any facial challenges of a penal law. *Farrell,* 449 F.3d at 485. As the Second Circuit held in *United States v. Nadi,* 996 F.2d 548, 550 (2d Cir.1993): "When the challenge is vagueness 'as-applied', there is a two-part

test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." (internal citations and quotation marks omitted).

Defendant argues that the term "personnel" is unconstitutionally vague as applied. She points to other cases where courts have struck the "personnel" language on vagueness grounds. Although the cases she cites addressed vagueness as to the statute and its definition prior to the 2004 clarifying amendment, defendant contends that even with the 2004 changes, the term "personnel" is still unconstitutionally vague.

Defendant primarily relies on the Ninth Circuit's decision in *HLP I* and on *Sattar*, a case from the Southern District of New York, both striking the "personnel" language on vagueness grounds. In *HLP I*, the plaintiffs sought to advocate before the United Nations and Congress on behalf of a designated FTO, and they brought an action to enjoin the statute's enforcement. The plaintiffs feared that they would be prosecuted for providing "personnel" under § 2339B. 205 F.3d at 1137–38. The Ninth Circuit found that the term "personnel" in the statute was unconstitutionally vague because "[s]omeone who advocates the cause of the [FTO] could be seen as supplying them with personnel ... [and] advocacy is pure speech protected by the First Amendment." *Id.* at 1137.

Similarly, in *Sattar*, the district court reached the same result. One of the defendants in *Sattar* was a lawyer representing the leader of the designated FTO, and the defendants, including this lawyer, were charged with providing material support in the form of "personnel" to the terrorists. The court granted the motion to dismiss the indictment on certain counts, finding that the term "personnel" was void for vagueness since it was unclear "what behavior constitutes an impermissible provision of personnel to an FTO." *Sattar*, 272 F.Supp.2d 348, 359 (S.D.N.Y.2003). Furthermore, the court noted that the government had failed to "explain how a lawyer, acting as an agent of her client, an alleged leader of an FTO, could avoid being subject to criminal prosecution" and therefore the government did not provide "notice to persons of ordinary intelligence" as to conduct prohibited. *Id.* at 359.[23]

Defendant's reliance on these two cases is misplaced. Here, the Government alleges that defendant, knowing that the PMOI was a designated FTO, taught English classes, translated documents and was assigned to the Political Department at Ashraf.[24] The Court finds that the alleged participation in Ashraf's Political Department is "unambiguously encompassed within the plain meaning of 'personnel,' and that the term "personnel" gives [defendant] adequate notice of the criminality of [participating in such a political wing of the PMOI]. *Warsame*, 537 F.Supp.2d at 1018 (rejecting vagueness challenge to "personnel" when the defendant voluntarily participated in an Al Qaeda training camp); *see also Awan*, 459 F.Supp.2d 167,

---

**23.** In *United States v. Sattar*, 314 F.Supp.2d 279, 296 (S.D.N.Y.2004), the court noted that the problem with the original indictment as to the dismissed counts was that " § 2339B could conceivably apply to someone engaging in advocacy on behalf of such an organization, conduct protected by the First Amendment."

**24.** These are among the activities that defendant engaged in for and on behalf of the PMOI. The scope of defendant's involvement and exactly what such conduct entailed has not been specifically provided to the Court.

178–79 (E.D.N.Y.2006) (rejecting vagueness challenge where the defendant was charged with providing funds and recruits to be used in furtherance of a conspiracy involving violence); *Marzook*, 383 F.Supp.2d at 1066 (finding that the term "personnel" is not unconstitutionally vague as applied to a defendant who recruits members to join an FTO because such facts "quite plainly constitute conduct one would expect to be criminalized under a statute that proscribes the provision of 'personnel' to an FTO"); *United States v. Lindh*, 212 F.Supp.2d 541, 574 (E.D.Va. 2002) (dismissing vagueness challenge to "personnel" where the prosecution alleged that the defendant fought in combat on behalf of the Taliban).

The provision of material support in the form of personnel at issue here—participation in the Political Department—is "unambiguously encompassed" within the statute because, unlike the facts in *HLP I* and *Sattar*, by engaging in this conduct and providing this support, defendant created an employment relationship with the PMOI. As the *Lindh* court explained:

> As already noted, the plain meaning of "personnel" is such that it requires, in the context of Section 2339B, an employment or employment-like relationship between the persons in question and the terrorist organization.... The term is aimed at denying the provision of human resources to proscribed terrorist organizations, and not at the mere independent advocacy of an organization's interests or agenda. Thus, the term "personnel" in Section 2339B gives fair notice to the

public of what is prohibited and the provision is therefore not unconstitutionally vague.

212 F.Supp.2d at 574. *See also United States v. Goba*, 220 F.Supp.2d 182, 194 (W.D.N.Y.2002) (rejecting defendants' attack on the § 2339B charge based on the purported vagueness of the prior, undefined, version of "personnel" because "one can be found to have 'provided material support or resources to a [designated] foreign terrorist organization' by offering one's services to said organization and allowing one's self to be indoctrinated and trained as a 'resource' in that organization's beliefs and activities").

On the Government's proffer of the facts that is before the Court, defendant's participation in the Political Department is not unconstitutionally vague. This participation appears to be more than just mere membership and more akin to an employment relationship. Therefore, this conduct is more than advocacy protected by the First Amendment. Making decisions on behalf of a designated FTO is clearly within the ambit of "personnel," and the First Amendment does not protect the conduct of giving such support to designated organizations. This finding applies to § 2339's definition of personnel both prior to the IRTPA amendment and following the clarification.[25] Furthermore, it is clear that the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited and it also provides explicit standards for those applying it.[26]

---

**25.** As a result, no *ex post facto* issue is raised. In the Government's supplemental papers, it correctly noted that clarifying amendments are applied retroactively and do not violate the constitutional prohibition against *ex post facto* laws. *See United States v. Gonzalez*, 281 F.3d 38, 46 (2d Cir.2002) (explaining that "[w]hen an amended version of a guideline

represents only a clarification ... of the original version rather than a substantive change, the amended version is to be applied .... [and] the *ex post facto* clause is not implicated").

**26.** As the *Marzook* court and others have pointed out, this determination "is further supported by the fact that the Department of

However, if the proof at trial shows only that defendant participated in the PMOI through mere membership and chanting at meetings, it may well be insufficient to reach a jury or sustain a guilty verdict. In addition, it is not clear for what purpose or in what scope defendant translated documents or taught English. The *Warsame* court found a similar problem in dealing with an allegation that the defendant had remained in communication with Al Qaeda associates after the defendant had returned from a training camp to Canada. The court found that such allegations "are not sufficient, without more, to survive a vagueness challenge .... [because] [w]hile such evidence may be admissible at trial for limited purposes, it would be inadmissible as evidence of guilt unless the prosecution ties such evidence to additional conduct that would constitute provision of "personnel" under the statute." *Warsame*, 537 F.Supp.2d at 1018. Like the communications at issue in *Warsame*, it is not clear at this point how teaching English or translating documents, without knowing more factual specifics, would constitute the provision of "personnel" under § 2339B. For example, if defendant taught English for the sole purpose of helping other members to advocate before the United Nations on behalf of the PMOI, the statute may not reach such conduct. However, the Court can envision other circumstances where teaching English classes or translating documents would be prohibited. *See e.g., id.* at 1019–20 (allegations that the defendant provided English lessons in an Al Qaeda clinic to assist nurses who attended to Al Qaeda members participating in terrorist training camps was prohibited under § 2339B).[27]

Regarding defendant's facial challenge on vagueness grounds, the Court finds that § 2339B does not reach a substantial amount of constitutionally protected

---

Justice's internal policies limit the risk of arbitrary enforcement (the more important concern in weighing vagueness challenges) under Section 2339B:"

It is the policy of the Department that a person may be prosecuted under § 2339B for providing "personnel" to a designated foreign terrorist organization if and only if that person has knowingly provided the organization with one or more individuals to work under the foreign entity's direction or control. Individuals who act independently of the designated foreign terrorist organization to advance its goals and objectives are not working under its direction or control and may not be prosecuted for providing "personnel" to a designated foreign terrorist organization. Only individuals who have subordinated themselves to the foreign terrorist organization, i.e., those acting as full-time or part-time employees or otherwise taking orders from the entity, are under its direction or control.

383 F.Supp.2d at 1066 n. 9.

**27.** Likewise, in *Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1134 (9th Cir.2007), the Ninth Circuit addressed a vagueness challenge to the term "training." Congress had amended the statute since the last time the court had heard such a challenge and defined the term "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(2). The plaintiffs argued that they were forced to guess as to whether training designated FTO members "in how to use humanitarian and international human rights law to seek peaceful resolution of ongoing conflict amounts to teaching a 'specific skill' or 'general[ized] knowledge.'" *Id.* at 1134. The court found it "highly unlikely that a person of ordinary intelligence would know whether, when teaching someone to petition international bodies for tsunami-related aid, one is imparting a 'specific skill' or 'general knowledge,'" and therefore found the statute's proscription on the provision of training void for vagueness. *Id.* Furthermore, the court noted that "limiting the definition of the term 'training' to the 'imparting of skills' does not cure unconstitutional vagueness because, so defined, the term 'training' could still be read to encompass speech and advocacy protected by the First Amendment." *Id.*

speech or association to warrant invalidation because the statute does not prohibit mere membership or association and only criminalizes the conduct of providing material support or resources to designated FTOs. *See Village of Hoffman Estates v. Flipside*, 455 U.S. at 494–95, 102 S.Ct. at 1191. Although it is possible that § 2339B could encompass a limited amount of First Amendment activity, as defendant posits, defendant has failed to demonstrate that this amount is substantial enough to warrant facial invalidation. *See Warsame*, 537 F.Supp.2d at 1020 (rejecting the defendant's facial vagueness challenge on the ground that he failed to demonstrate that the statute reaches a substantial amount of constitutionally protected speech); *Marzook*, 383 F.Supp.2d at 1066 (same).

The main issue with the hypotheticals that defendant poses as possibilities where the statute could be applied to abridge First Amendment activity is that it is extremely unlikely that the activities described in them would be considered criminal under § 2339B. Most of the examples regarding an unaffiliated writer of an op-ed piece supporting a designated organization do not meet the statute's "direction and control" restriction. They simply do not create employment or quasi-employment relationships. Furthermore, the oft-cited hypothetical of a cab driver who drives a passenger from a New York airport to the United Nations, knowing that the passenger is a member of an FTO, standing alone does not fall within the statute. In that example, although the driver is providing transportation, he is doing so to an individual who happens to be a member of a terrorist organization. This is not prohibited by the statute because § 2339B requires that a defendant "knowingly provides material support or resources to a foreign terrorist *organization*." (emphasis added).

For the reasons stated above, the Court finds that the term "personnel" is not unconstitutionally vague as applied to defendant's conduct. The Court does note, however, that certain allegations, such as the chanting, teaching of English and translating of documents, without more specific facts adduced at trial, may be insufficient to survive a vagueness challenge. Finally, the Court concludes that § 2339B is also not facially vague. Therefore, the Court denies defendant's motion to dismiss on vagueness grounds.

## V. *Overbreadth*

Defendant's next argument is closely related to her vagueness challenge: she contends that § 2339B is impermissibly overbroad because it criminalizes both protected First Amendment activity and unprotected conduct. A defendant against whom a statute has been lawfully applied may not normally challenge the application of the statute as it may be applied to others, but "[t]he First Amendment doctrine of substantial overbreadth is an exception to the general rule." *Massachusetts v. Oakes*, 491 U.S. 576, 581, 109 S.Ct. 2633, 2637, 105 L.Ed.2d 493 (1989). However, it should be noted that due to "the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished ... [the Supreme Court has] recognized that the overbreadth doctrine is 'strong medicine' and [has] employed it with hesitation, and then only as a last resort." *Los Angeles Police Dept. v. United Reporting Pub. Corp.*, 528 U.S. 32, 39, 120 S.Ct. 483, 489, 145 L.Ed.2d 451 (1999) (internal citations and quotations omitted).

A statute is overbroad if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia*

*v. Hicks*, 539 U.S. 113, 118–19, 123 S.Ct. 2191, 2196, 156 L.Ed.2d 148 (2003) (internal quotation marks and citation omitted). The Supreme Court has cautioned that "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Id.* at 119, 123 S.Ct. at 2197. Therefore, courts have "insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the strong medicine of overbreadth invalidation." *Hicks*, 539 U.S. at 119–20, 123 S.Ct. at 2197 (internal quotations and citations omitted). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstration)." *Id.* at 124, 123 S.Ct. at 2199.

■■■ Defendant has failed to demonstrate that the statute reaches a substantial amount of protected First Amendment activity. Numerous courts addressing this same issue have consistently explained that the statute is not violated by mere membership or association. Rather, § 2339B prohibits the conduct of providing "material support" to an FTO. This statutory requirement, as the courts have recognized, avoids the concern that an individual might face criminal sanctions for mere association with an FTO. *See Hammoud,* 381 F.3d at 330 (finding that § 2339B does not prohibit mere association with an FTO and is therefore not overbroad).

Although there may be a few potential examples where the statute could possibly be used to punish protected speech, as the *Hammoud* court explained, such hypothetical scenarios do not require a court to invalidate the statute in its entirety on overbreadth grounds. 381 F.3d at 330 (finding that a defendant bears the burden of establishing that any such overbreadth "is substantial in relation to the legitimate reach of § 2339B"). Defendant's brief discussion of this doctrine does not meet such a showing. Therefore, the Court denies defendant's motion to dismiss on overbreadth grounds.

## VI. *Outrageous Prosecution*

Finally, defendant argues that the Government's prosecution of her is so outrageous that the Court should dismiss the Indictment.[28] She supports this position by maintaining that: 1) the United States military may now be using the PMOI to gather intelligence; 2) following the interview stage at Ashraf, the FBI cleared the residents of any wrongdoing; and 3) the designation of the PMOI as an FTO is the product of unilateral State Department action.[29]

A claim of outrageous government conduct is one for a court to decide. *See United States v. Nunez–Rios,* 622 F.2d 1093, 1098 (2d Cir.1980). The Supreme Court noted in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), that it may "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a con-

---

**28.** Defendant suggests in the alternative that the Court conduct an evidentiary hearing on this issue. For the same reasons that the Court denies defendant's motion to dismiss

the Indictment on this basis, the Court also denies the motion for an evidentiary hearing.

**29.** Defendant submitted press reports to the Court to buttress these arguments.

viction." However, only government conduct that " 'shocks the conscience' " can violate due process. *United States v. Chin*, 934 F.2d 393, 398 (2d Cir.1991) (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)). *See also United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir.1991) ("In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction," if the government's conduct "reach[ed] a demonstrable level of outrageousness.") (citation omitted; alteration in original). Courts almost never find such violations because this standard is so high. *See United States v. Berkovich*, 168 F.3d 64, 69 (2d Cir.1999); *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir.1997) ("Ordinarily such official misconduct must involve either coercion . . . or violation of the defendant's person. . . . Absent such extreme misconduct, relief in the form of reversal of a conviction is rare.") (internal citations omitted).

■ The prosecution of defendant for providing material support to the PMOI, a designated FTO, does not meet this exacting standard. As the Government has explained, a federal grand jury returned the Indictment against defendant based on adequate information. In addition, the Government allegedly has witness testimony and videotape evidence to support the charge against defendant. The fact that defendant has located newspaper articles and comments by members of Congress and the United States Military that the PMOI should not be so designated and that the organization has provided assistance to the United States and to the interests of the country does not make this prosecution sufficiently outrageous so "that common notions of fairness and decency would be offended were judicial pro-

cesses invoked to obtain a conviction." *Schmidt*, 105 F.3d at 91.

Furthermore, there is nothing outrageous about giving military support to certain elements of the PMOI while at the same time prosecuting an allegedly high ranking member for violating the material support statute. Foreign relations generally and specifically during a time of war are not black and white, and the PMOI need not be viewed as a monolithic entity. It is perfectly permissible for the military to forge alliances with those in the PMOI with whom it wants to deal, while the Government deters through prosecution other individuals, particularly United States citizens, from rendering material support to the organization on their own. The key point is that through covert and overt means, the Executive and the United States military may seek to exercise control over designated entities, which control could easily be weakened by the decisions of United States citizens to render on their own what they consider to be proper support for the entity. There is thus nothing more outrageous about targeted support in some areas and targeted prosecution in other areas than there is about any other aspect of war, itself an outrageous but, as determined by other branches of government, sometimes necessary undertaking.

### CONCLUSION

Defendant's motion to dismiss the Indictment is denied.

**SO ORDERED.**