205 F.3d 1130 (9th Cir. 2000)
 HUMANITARIAN LAW PROJECT; RALPH FERTIG; ILANKAI THAMIL SANGAM; TAMILS OF NORTHERN CALIFORNIA; TAMIL WELFARE AND HUMAN RIGHTS COMMITTEE; FEDERATION OF TAMIL SANGAMS OF NORTH AMERICA; WORLD TAMIL COORDINATING COMMITTEE; NAGALINGAM JEYALINGAM, Plaintiffs-Appellants,
v.
JANET RENO, as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; MADELEINE K. ALBRIGHT, as United States Secretary of State; UNITED STATES DEPARTMENT OF STATE, Defendants-Appellees.
HUMANITARIAN LAW PROJECT; RALPH FERTIG; ILANKAI THAMIL SANGAM; TAMILS OF NORTHERN CALIFORNIA; TAMIL WELFARE AND HUMAN RIGHTS COMMITTEE; FEDERATION OF TAMIL SANGAMS OF NORTH AMERICA; WORLD TAMIL COORDINATING COMMITTEE; OPINION NAGALINGAM JEYALINGAM, Plaintiffs-Appellees,
v.
JANET RENO, as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; MADELEINE K. ALBRIGHT, as United States Secretary of State; UNITED STATES DEPARTMENT OF STATE, Defendants-Appellantss.
 Nos. 98-56062, 98-56280
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 1, 1999
Decided March 3, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: David Cole, Institute for Public Representation, Washington, D.C.,Paul Hoffman, Santa Monica, California, argued the cause for plaintiffs-appellants. With him on the briefs were Nancy Chang, Center for Constitutional Rights, New York, New York. Also on the briefs were Carol A. Sobel, Santa Monica, California for plaintiffappellant Tamils of Northern California and Visuvanathan Rudrakumaran, New York, New York, for plaintiffsappellants Tamils of Northern California and World Tamil Coordinating Committee.
 Douglas N. Letter, United States Department of Justice, Civil Division, Washington, D.C., argued the cause for defendantsappellees. With him on the briefs were John R. Tyler, Martha Rubio and David Anderson.
 Linda Dakin-Grimm, Chadbourne and Parke, Washington D.C. and Los Angeles, California, filed an amicus brief urging affirmance for the Anti-Defamation League. With her on the briefs were David M. Raim, Philip J. Goodman and Joy L. Langford.
 Appeals from the United States District Court for the Central District of California. Audrey B. Collins, District Judge, Presiding D.C. No. CV-98-01971-ABC
 Before: Dorothy W. Nelson, Alex Kozinski and Stephen S. Trott, Circuit Judges.
 Opinion by Judge Kozinski
 OPINION
 KOZINSKI, Circuit Judge:
 
 
 1
 We consider whether Congress may, consistent with the First Amendment, prohibit contributions of material support to certain foreign terrorist organizations.
 
 
 2
 * The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, known among the cognoscenti as AEDPA, authorizes the Secretary of State to "designate an organization as a foreign terrorist organization . . . if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity of the organization threatens
 
 
 3
 the security of United States nationals or the national security of the United States." AEDPA S 302(a), 110 Stat. at 1248 (codified at 8 U.S.C. S 1189(a)).
 
 
 4
 This provision has teeth. AEDPA decrees punishment by fine, imprisonment for up to 10 years or both on"[w]hoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so . . . ." AEDPA S 303(a), 110 Stat. at 1250 (codified at 18 U.S.C. S 2339B(a)(1)). The phrase "material support or resources" is broadly defined as "currency or other financial securities,financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." AEDPA S 323, 110 Stat. at 1255 (codified at 18 U.S.C. S 2339A(b)).
 
 
 5
 Pursuant to those guidelines, the Secretary had, as of October 1997, designated 30 organizations as foreign terrorist organizations. See Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650, 52,650-51 (1997). Two such entities are the Kurdistan Workers' Party ("PKK") and the Liberation Tigers of Tamil Eelam ("LTTE"). Plaintiffs, six organizations and two United States citizens, wish to provide what they fear would be considered material support to the PKK and LTTE. Plaintiffs claim that such support would be directed to aid only the nonviolent humanitarian and political activities of the designated organizations. Being prohibited from giving this support, they argue, infringes their associational rights under the First Amendment. Because the statute criminalizes the giving of material support to an organization regardless of whether the donor intends to further the organization's unlawful ends, plaintiffs claim it runs afoul of the rule set forth in cases such as NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982). That rule, as succinctly stated in Claiborne Hardware, is "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." Id. at 920. Plaintiffs further complain that AEDPA grants the Secretary unfettered and unreviewable authority to designate which groups are listed as foreign terrorist organizations, a violation of the First and Fifth Amendments. Lastly, plaintiffs maintain that AEDPA is unconstitutionally vague.
 
 
 6
 Plaintiffs sought a preliminary injunction barring enforcement of AEDPA against them. The district court denied the injunction, for the most part. See Humanitarian Law Project v. Reno, 9 F. Supp. 2d 1176, 1204 (C.D. Cal. 1998). However, it agreed with plaintiffs that AEDPA was impermissibly vague, specifically in its prohibition on providing "personnel" and "training." The court therefore enjoined the enforcement of those prohibitions. See id. at 1204-05. Each side appeals its losses.
 
 II
 
 7
 A. Plaintiffs try hard to characterize the statute as imposing guilt by association, which would make it unconstitutional under cases such as Claiborne Hardware. But Claiborne Hardware and similar cases address situations where people are punished "by reason of association alone," Claiborne Hardware, 458 U.S. at 920--in other words, merely for membership in a group or for espousing its views. AEDPA authorizes no such thing. The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. Plaintiffs are even free to praise the groups for using terrorism as a means of achieving their ends. What AEDPA prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions. Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives.
 
 
 8
 B. Plaintiffs also insist that AEDPA is unconstitutional because it proscribes the giving of material support even if the donor does not have the specific intent to aid in the organization's unlawful purposes. They rely on American-Arab AntiDiscrimination Comm. v. Reno, 70 F.3d 1045 (9th Cir. 1995) (ADC I), where we declared that "[t]he government must establish a `knowing affiliation' and a `specific intent to further those illegal aims' " in order topunish advocacy. Id. at 1063 (quoting Healy v. James, 408 U.S. 169, 186 (1972)). But advocacy is far different from making donations of material support. Advocacy is always protected under the First Amendment whereas making donations is protected only in certain contexts. See Section II.C. infra. Plaintiffs here do not contend they are prohibited from advocating the goals of the foreign terrorist organizations, espousing their views or even being members of such groups. They can do so without fear of penalty right up to the line established by Brandenburg v. Ohio, 395 U.S. 444 (1969).
 
 
 9
 It is true that in American-Arab Anti-Discrimination Comm. v. Reno, 119 F.3d 1367 (9th Cir. 1997) (ADC II), vacated, 119 S. Ct. 936 (1999), we said that in ADC I "we had before us evidence that [the] associational activities [that the plaintiffs engaged in] included fundraising." Id. at 1376. But ADC II has been vacated, and we can find no language in ADC I holding that fundraising enjoys First Amendment protection on a par with pure speech or advocacy. We are not bound by ADC II's characterization of ADC I, and we find it unpersuasive. Material support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent. Once the support is given, the donor has no control over how it is used. We therefore do not agree with ADC II's implied holding that the First Amendment requires the government to demonstrate a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds.
 
 
 10
 C. Plaintiffs make a separate First Amendment argument based on the fact that the terrorist organizations in question also engage in political advocacy. Pointing to cases such as Buckley v. Valeo, 424 U.S. 1 (1976), and In re Asbestos Sch. Litig., 46 F.3d 1284 (3d Cir. 1994), plaintiffs argue that providing money to organizations engaged in political expression is itself both political expression and association. See Buckley, 424 U.S. at 44-45 ("[T]he constitutionality of [the restrictions on contributions to political candidates] turns on whether the government interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression.").[1] However, the cases equating monetary support with expression involved organizations whose overwhelming function was political advocacy. Buckley is the quintessential example where the contributions were made to candidates for political office for the purpose of helping them engage in electioneering. See Buckley, 424 U.S. at 12-13. Under those circumstances, money, and the things money can buy, do indeed serve as a proxy for speech and demonstrate one's association with the organization. However, even in Buckley, the Court treated limits on donations differently from limits on candidates' expenditures of personal funds.[2] While the First Amendment protects the expressive component of seeking and donating funds, expressive conduct receives significantly less protection thanpure speech. See Texas v. Johnson, 491 U.S. 397, 406 (1989) ("The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.") (citing United States v. O'Brien, 391 U.S. 367, 376-77 (1968)). The government may thus regulate contributions to organizations that engage in lawful-but non-speech related--activities. And it may certainly regulate contributions to organizations performing unlawful or harmful activities, even though such contributions may also express the donor's feelings about the recipient. Cf. Young v. New York City Transit Auth., 903 F.2d 146, 157 (2d Cir. 1990) (analyzing ban on panhandling on New York City subways under intermediate scrutiny, even while expressing doubt as to whether "begging and panhandling possess some degree of a communicative nature").
 
 
 11
 Contrary to plaintiffs' argument, the material support restriction here does not warrant strict scrutiny because it is not aimed at interfering with the expressive component of their conduct but at stopping aid to terrorist groups. Compare O'Brien, 391 U.S. at 376-77 (applying intermediate scrutiny to regulation prohibiting the burning of any draft card) with Johnson, 491 U.S. at 406 (applying strict scrutiny to law prohibiting only the burning of flags which offended witnesses). Intermediate scrutiny applies where, as here, "a regulation . . . serves purposes unrelated to the content of expression." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).
 
 
 12
 When we review under the intermediate scrutiny standard, we must ask four questions: Is the regulation with the power of the government? Does it promote an important or substantial government interest? Is that interest unrelated to suppressing free expression? And, finally, is the incidental restriction on First Amendment freedoms no greater than necessary? See O'Brien, 391 U.S. at 377; Jones Intercable, Inc. v. City of Chula Vista, 80 F.3d 320, 325 (9th Cir. 1996).
 
 
 13
 Here all four questions are answered in the affirmative. First, the federal government clearly has the power to enact laws restricting the dealings of United States citizens with foreign entities; such regulations have been upheld in the past over a variety of constitutional challenges. See , e.g., Regan v. Wald, 468 U.S. 222, 244 (1984) (restrictions on travel to Cuba did not violate Fifth Amendment); Zemel v. Rusk, 381 U.S. 1, 16-17 (1965) (same); see also DKT Mem'l Fund Ltd. v. Agency for Int'l Dev., 887 F.2d 275, 295 (D.C. Cir. 1989) ("[T]he right of Americans to associate with nonresident aliens `is not absolute.' ") (quoting Palestine Info. Office v. Shultz, 853 F.2d 932, 941 (D.C. Cir. 1988)); Teague v. Regional Comm'r of Customs, 404 F.2d 441, 445 (2d Cir. 1968) (upholding regulations "designed to limit the flow of currency to specified hostile nations" despite the fact that regulations "impinge[d] on first amendment freedoms"). Second, the government has a legitimate interest in preventing the spread of international terrorism, and there is no doubt that that interest is substantial.[3] Third, this interest is unrelated to suppressing free expression because it restricts the actions of those who wish to give material support to the groups, not the expression of those who advocate or believe the ideas that the groups supports.
 
 
 14
 So the heart of the matter is whether AEDPA is well enough tailored to its end of preventing the United States from being used as a base for terrorist fundraising. Because the judgment of how best to achieve that end is strongly bound up with foreign policy considerations, we must allow the political branches wide latitude in selecting the means to bring about the desired goal. Plaintiffs argue that the prior statutory scheme, which allowed the donation of humanitarian assistance to those who were not directly involved in terrorist activity, see 18 U.S.C. S 2339A(b) (1994) (amended 1996), was properly tailored and the current statutory scheme is therefore overbroad. But the fact that the prior statutory scheme was narrower tells us nothing about whether the current scheme is overbroad, because we don't know how well the prior scheme worked. Presumably Congress thought that it did not work well enough and so decided to broaden it. Moreover, the Supreme Court has held that the government need not select the least restrictive or least intrusive means of accomplishing its purpose. See Ward, 491 U.S. at 798.
 
 
 15
 Congress explicitly incorporated a finding into the statute that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct. " AEDPA S 301(a)(7), 110 Stat. at 1247. It follows that all material support given to such organizations aids their unlawful goals.[4] Indeed, as the government points out, terrorist organizations do not maintain open books. Therefore, when someone makes a donation to them, there is no way to tell how the donation is used. Further, as amicus Anti-Defamation League notes, even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive. More fundamentally, money is fungible; giving support intended to aid an organization's peaceful
 
 
 16
 activities frees up resources that can be used for terrorist acts. We will not indulge in speculation about whether Congress was right to come to the conclusion that it did. We simply note that Congress has the fact-finding resources to properly come to such a conclusion. Thus, we cannot say that AEDPA is not sufficiently tailored.
 
 
 17
 D. Plaintiffs also argue that the statute violates their First and Fifth Amendment rights by giving the Secretary "unfettered discretion" to limit their right to associate with certain foreign organizations, and by insulating her decisions from judicial review. Plaintiffs rely on Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992), and Gaudiya Vaishnava Soc. v. City of San Francisco, 952 F.2d 1059 (9th Cir. 1991). These cases involved licensing schemes that were held to violate the Constitution by granting government officials unfettered discretion to regulate First Amendment activity. We note that the regulations in Forsyth and Gaudiya Vaishnava directly governed activities protected by the First Amendment. In Forsyth it was a parade; in Gaudiya Vaishnava it was the sale of merchandise carrying political, religious, philosophical or ideological messages. In both cases, government officials were empowered to permit or prohibit the activity entirely at their discretion. As we have already explained, AEDPA does not regulate speechor association per se. Rather, the restriction is on the act of giving material support to designated foreign organizations. The government may regulate expressive conduct to a greater degree than pure speech or association. See p. 1135 supra.
 
 
 18
 Moreover, AEDPA does not grant the Secretary unfettered discretion in designating the groups to which giving material support is prohibited. The statute authorizes the Secretary to designate only those groups that engage in terrorist activities. This standard is not so vague or indeterminate as to give the Secretary unfettered discretion. For example, the Secretary could not, under this standard, designate the International Red Cross or the International Olympic Committee as terrorist organizations. Rather, the Secretary must have reasonable grounds to believe that an organization has engaged in terrorist acts--assassinations, bombings, hostage-taking and the like--before she can place it on the list. See 8 U.S.C. S 1182(a)(3). This standard is sufficiently precise to satisfy constitutional concerns. And, because the regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context. See Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1438 (9th Cir. 1996). Plaintiffs argue that any decision the Secretary makes in designating an organization is essentially unreviewable. However, 8 U.S.C. S 1189(b) provides for judicial review of the Secretary's decision in the United States Court of Appeals for the District of Columbia Circuit. Although plaintiffs complain that the review is ineffectual because of the degree of deference accorded to the Secretary's decision, that is a necessary concomitant of the foreign affairs power. In any event, that challenge must be raised in an appeal from a decision to designate a particular organization.
 
 
 19
 E. Finally, Plaintiffs challenge AEDPA on vagueness grounds. In the district court, they alleged that "foreign terrorist organization" and "material support," as defined in AEDPA, were void for vagueness. The district court agreed in part, finding that two of the components included within the definition of material support, "training" and "personnel," were impermissibly vague. It enjoined the prosecution of any of the plaintiffs' members for activities covered by these terms. The district court did not abuse its discretion in doing so.
 
 
 20
 When a criminal law implicates First Amendment concerns, the law must be "sufficiently clear so as to allow persons of `ordinary intelligence a reasonable opportunity to know what is prohibited.' " Foti v. City of Menlo Park, 146 F.3d 629, 638 (9th Cir. 1998) (quoting Grayned v. City of
 
 
 21
 Rockford, 408 U.S. 104, 108 (1972)). Accord United States v. Griefen, 200 F.3d 1256, 1266 (9th Cir. 2000). It is easy to see how someone could be unsure about what AEDPA prohibits with the use of the term "personnel," as it blurs the line between protected expression and unprotected conduct. See, e.g., Free Speech Coalition v. Reno, 98 F.3d 1083, 1095-96 (9th Cir. 1999) (prohibition of images that "appear[ ] to be" or "convey the impression" of a minor engaged in sexual activity is void for vagueness and overbroad as it could prohibit "material that has been accorded First Amendment protection"). Someone who advocates the cause of the PKK could be seen as supplying them with personnel; it even fits under the government's rubric of freeing up resources, since having an independent advocate frees up members to engage in terrorist activities instead of advocacy. But advocacy is pure speech protected by the First Amendment.
 
 
 22
 In order to keep the statute from trenching on such advocacy, the government urges that we read into it a requirement that the activity prohibited be performed "under the direction or control" of the foreign terrorist organization. While we construe a statute in such a way as to avoid constitutional questions, see Crowell v. Benson, 285 U.S. 22, 62 (1932), we are not authorized to rewrite the law so it will pass constitutional muster, see Swain v. Pressley, 430 U.S. 372, 378-79 n.11 (1977); see also United States v. United States Dist. Court for the Cent. Dist. of Cal., 858 F.2d 534, 542 (9th Cir. 1988) ("[A]lthough we may strain to construe legislation so as to save it against constitutional attack, we must not and will not carry this to the point of perverting the purpose of a statute or judicially rewriting it.") (citations and internal quotation marks omitted). This is especially true in the case of an interlocutory appeal from a preliminary injunction, because of the deferential standard of review applicable in such situations. See Does 1-5 v. Chandler, 83 F.3d 1150, 1152 (9th Cir. 1996).
 
 
 23
 The term "training" fares little better. Again, it is easy to imagine protected expression that falls within the bounds of this term. For example, a plaintiff who wishes to instruct members of a designated group on how to petition the United Nations to give aid to their group could plausibly decide that such protected expression falls within the scope of the term "training." The government insists that the term is best understood to forbid the imparting of skills to foreign terrorist organizations through training. Yet, presumably, this definition would encompass teaching international law to members of designated organizations. The result would be different if the term "training" were qualified to include only military training or training in terrorist activities. Because plaintiffs have demonstrated that they are likely to succeed on the merits of their claim with respect to the terms "training" and "personnel," we conclude that the district court did not abuse its discretion in issuing its limited preliminary injunction.[5]
 
 
 24
 The judgment of the district court is AFFIRMED.
 
 
 
 NOTES:
 
 
 [1]
 What is at issue here is the right of Americans to express their association with foreign political advocacy of the PKK LITE directed toward
 their own governments is not protected by all first ammendment. CF United States
 v. verdugour quidez, 494 U.S. 259(1990) (refusing to extend constitutional protection to mexican citizens.
 
 
 [2]
 Buckley explained that a candidate spending his own money to get his message out was political speech whereas a donation was symbolic speech. See 424 U.S. at 21("A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his polictical communication, for it permits a symbolic expression of support evidenced by a contribution but does not in anyway infringe the contributors freedom to discuss candidates and issues.").
 
 
 [3]
 Plaintiffs complain that the statute allows the designation not only of groups who threaten our "national defense," but also those groups that imperil our "foreign relations" or "economic interests." But "[p]rotection of the foreign policy of the United States is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized." Haig v. Agee, 453 U.S. 280, 307 (1981). The same, of course, is true of our economic interests.
 
 
 [4]
 Plaintiffs argue that this finding is undercut by other portions of the statute that allow the donation of unlimited amounts of medicine and religious items. We see things differently. Congress is entitled to conclude that respect for freedom of religion militates in favor of allowing religious items to be donated to foreign organizations, even though doing so may incidentally aid terrorism. Further it could also rationally decide that the humanitarian value of providing medicine to such organizations outweighs the risk that the medicine would be sold to finance terrorist activities. Congress is entitled to strike such delicate balances without giving up its ability to prohibit other types assistance which would promote terrorism.
 
 
 [5]
 The government invites us to cure any possible vagueness problems with the statute by including the term "knowingly" in it. However, the term "knowingly" modifies the verb "provides," meaning that the only scienter requirement here is that the accused violator have knowledge of the fact that he has provided something, not knowledge of the fact that what is provided in fact constitutes material support. 2372