**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TAMARA FIELDS, on behalf of herself, as a representative of the Estate of Lloyd Fields, Jr.; HEATHER CREACH, on behalf of herself and as a representative of the Estate of James Damon Creach; J.C. (1), a minor; J.C. (2), a minor, *Plaintiffs-Appellants*, <br><br> v. <br><br> TWITTER, INC., *Defendant-Appellee.* | No. 16-17165 <br><br> D.C. No. 3:16-cv-00213-WHO <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted December 6, 2017
San Francisco, California

Filed January 31, 2018

Before:  MILAN D. SMITH, JR. and SANDRA S. IKUTA,
Circuit Judges, and STEVEN J. MCAULIFFE,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

_____

# SUMMARY[**]

_____

## Anti-Terrorism Act

The panel affirmed the district court's dismissal of an action seeking civil remedies under the Anti-Terrorism Act against Twitter, Inc.

Plaintiffs, whose family members were killed while working as government contractors in Jordan in an attack for which ISIS claimed credit, alleged injury "by reason of" Twitter's knowing provision of material support to ISIS.

The panel affirmed the district court's holding that plaintiffs failed to adequately plead proximate causation because, to satisfy the ATA's "by reason of" requirement, a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts.

_____

[*] The Honorable Steven J. McAuliffe, Senior United States District Judge for the District of New Hampshire, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel declined to reach the district court's additional holding that Twitter's liability was precluded by § 230 of the Communications Decency Act because plaintiffs' claims sought to treat Twitter as the publisher of ISIS's content.

## COUNSEL

Joshua D. Arisohn (argued), L. Timothy Fisher, and Scott A. Bursor, Bursor & Fisher P.A., Walnut Creek, California, New York, New York, for Plaintiffs-Appellants.

Seth P. Waxman (argued), Patrick J. Carome, and Ari Holtzblatt, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Mark D. Flanagan, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, California; for Defendant-Appellee.

Aaron Mackey, Jamie Williams, and Sophia Cope, Electronic Frontier Foundation, San Francisco, California, for Amici Curiae Electronic Frontier Foundation and Center for Democracy & Technology.

Sonali D. Maitra, Durie Tangri LLP, San Francisco, California, for Amicus Curiae Internet Association.

Catherine R. Gellis, Sausalito, California, for Amicus Curiae Floor 64 Inc. DBA The Copia Institute.

**OPINION**

M. SMITH, Circuit Judge:

After Lloyd "Carl" Fields, Jr., and James Damon Creach were killed while working as government contractors in Jordan in an attack for which ISIS claimed credit, Plaintiffs-Appellants sued Defendant-Appellee Twitter, Inc. (Twitter) pursuant to 18 U.S.C. § 2333(a), the civil remedies provision of the Anti-Terrorism Act (ATA), alleging that they were injured "by reason of" Twitter's knowing provision of material support to ISIS. Twitter moved to dismiss the case, and its motion was granted. The district court held that Plaintiffs-Appellants had failed to plead that they were injured "by reason of" Twitter's conduct. The district court also ruled that Twitter's liability was precluded by § 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230(b), because Plaintiffs-Appellants' claims sought to treat Twitter as the publisher of ISIS's content. Plaintiffs-Appellants have appealed both holdings. We affirm on the ground that Plaintiffs-Appellants have failed to adequately plead proximate causation.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Deaths of Lloyd "Carl" Fields, Jr., and James Damon Creach

Plaintiffs-Appellants Tamara Fields and Heather Creach brought this lawsuit on behalf of themselves and as representatives of the estates of their husbands, Lloyd "Carl" Fields, Jr. (Fields), and James Damon Creach (Creach), respectively. They are joined as Plaintiffs-Appellants by J.C. (1) and J.C. (2), Creach's two minor sons, who are represented by their common legal guardian, Heather Creach. All Plaintiffs-Appellants are American nationals.

This case arises from the tragic deaths of Fields and Creach in Jordan, on November 9, 2015. Fields had "travelled to Jordan on June 12, 2015 as a government contractor through DynCorp International." "Creach [had] arrived in Jordan on October 15, 2015[,] where he was working through the government contractor DECO, Inc." While in Jordan, both men were assigned to work at the International Police Training Center (the IPTC) in southeast Amman, where they "both used their years of experience as police officers to train law enforcement personnel from Jordan, Iraq and the Palestinian Territories in basic police and security skills." Fields "had previously served as a Deputy Sheriff in Calcasieu Parish, Louisiana, and as a police advisor in both Iraq and Afghanistan." Creach "was a graduate of the Virginia Beach Polic[e] Academy, a former police officer in the Virginia Police Department and had trained police officers in Afghanistan, Kenya and other locations."

One of the students at the IPTC was Anwar Abu Zaid (Abu Zaid), a "28-year old Jordanian police captain." "On November 9, 2015, Abu Zaid arrived at [the] IPTC[,] smuggling [in] a Kalashnikov assault rifle with 120 bullets and two handguns in his car." Because he was an officer, he was not searched upon entry. "After the noontime prayer, Abu Zaid shot a truck that was moving through the facility, killing [Creach]. Abu Zaid then entered the facility's cafeteria where he killed an additional four people eating lunch, including [Fields]." Israeli military intelligence ultimately determined that "Abu Zaid was a graduate of al-Mutah University in al-Karak, Jordan where he was part of

a clandestine . . . terror cell" associated with the Islamic State of Iraq and Syria (al-Sham) (ISIS).**[1]**

**"**ISIS claimed responsibility for the attack in a statement issued through [its] al-Battar Media Foundation: 'Yes . . . we kill the Americans in Amman,' the terror group said." ISIS reiterated the claim in its Dabiq Magazine, Issue 12:

> "And on 9 November 2015, Anwar Abu Zeid — after repenting from his former occupation — attacked the American crusaders and their apostate allies, killing two American crusaders, two Jordanian apostates, and one South African crusader. These are the deeds of those upon the methodology of the revived Khilāfah. They will not let its enemies enjoy rest until enemy blood is spilled in revenge for the religion and the Ummah."

## II. Twitter's Conduct

Plaintiffs-Appellants have sued Twitter pursuant to 18 U.S.C. § 2333(a), the ATA's civil remedies provision. Plaintiffs-Appellants accuse Twitter of violating § 2333(a) by knowingly providing material support to ISIS, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B.**[2]** Specifically, Plaintiffs-Appellants allege that Twitter (1) provided material support to ISIS, a Foreign Terrorist

---

**[1]** ISIS is also known as "the Islamic State of Iraq and the Levant," the "Islamic State," "ad-Dawlah al-Islāmiyah fīl-ʿIrāq wash-Shām," and "al-Qaeda in Iraq."

**[2]** "Material support or resources" is defined statutorily to include, among other things, any "service" and "communications equipment." 18 U.S.C. § 2339A(b); *see also id.* § 2339B(g)(4).

Organization (FTO), in the form of Twitter accounts and direct-messaging services, (2) did so knowingly and recklessly, and (3) thereby proximately caused Plaintiffs-Appellants' injuries.

These allegations are segregated into three sections of Plaintiffs-Appellants' Second Amended Complaint (SAC). First, in support of their material-support allegation, Plaintiffs-Appellants claim that Twitter has provided ISIS with Twitter accounts. Plaintiffs-Appellants identify three examples of ISIS-affiliated Twitter accounts with large numbers of followers, which constitute a fraction of the "estimated 70,000 Twitter accounts, at least 79 of which were 'official,'" that ISIS had as of December 2014. Plaintiffs-Appellants contend that "[s]ince 2010, Twitter has provided ISIS with dozens of accounts on its social network," and until recently did nothing while "the number of ISIS accounts on Twitter grew at an astonishing rate."

Second, in support of their scienter allegation, Plaintiffs-Appellants assert that ISIS is a well-known FTO that openly uses Twitter. Plaintiffs-Appellants claim that "[t]he United Nations and international NGOs have condemned ISIS for war crimes and ethnic cleansing," and that the United States designated ISIS an FTO on December 17, 2004. Plaintiffs-Appellants also provide numerous examples of media reports documenting ISIS's Twitter usage, which reports have prompted many government officials and technology experts to urge Twitter to be more aggressive in combating terrorism. Only recently has Twitter responded by changing its rules to prohibit threats of violence or terrorism and terrorism promotion, and by suspending terrorism-promoting accounts.

Third, in support of their causation allegation, Plaintiffs-Appellants allege ways in which ISIS uses Twitter.

Plaintiffs-Appellants indicate that ISIS uses Twitter's Direct Messaging feature to communicate with potential recruits and "for fundraising and operational purposes." They assert that ISIS also uses Twitter to recruit more publicly, by posting "instructional guidelines and promotional videos, referred to as 'mujatweets.'" Plaintiffs-Appellants also claim that within the year preceding August 2016 alone, Twitter allowed ISIS to attract "more than 30,000 foreign recruits," and that ISIS uses Twitter to fundraise and to "spread propaganda and incite fear by posting graphic photos and videos of its terrorist feats."

## III.    Prior Proceedings

Plaintiffs-Appellants filed their complaint on January 13, 2016. After Twitter filed its first motion to dismiss on March 10, 2016, Plaintiffs-Appellants filed an Amended Complaint on March 24, 2016. Twitter again moved to dismiss on April 6, 2016, and its motion was granted with leave to amend on August 10, 2016. Plaintiffs-Appellants filed the SAC on August 30, 2016, and Twitter filed a motion to dismiss it on September 13, 2016. The motion was granted with prejudice on November 18, 2016, and a final judgment was entered. This appeal timely followed.

## STANDARD OF REVIEW

"We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 970 (9th Cir. 2017) (quoting *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012)). "We also review de novo questions of statutory interpretation." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).

## ANALYSIS

### I.  The ATA's Proximate Causation Requirement

The civil remedies section of the ATA allows any United States national "injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs," to sue in federal court and recover treble damages and attorney's fees.  18 U.S.C. § 2333(a).[3]

The ATA also contains criminal provisions, the violation of which can provide the basis for a cause of action under § 2333(a).  As relevant here, § 2339A prohibits the provision of "material support or resources" by anyone "knowing or intending that they are to be used in preparation for, or in carrying out" any of several enumerated crimes.  18 U.S.C. § 2339A.  Section 2339B prohibits the knowing provision of "material support or resources to a foreign terrorist organization."  *Id.* § 2339B(a)(1).

Plaintiffs-Appellants allege that Twitter violated both § 2339A and § 2339B when it knowingly provided Twitter

---

[3] The term "international terrorism" is statutorily defined to include activities occurring abroad that "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State" and "(B) appear to be intended — (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping . . . ." 18 U.S.C. § 2331(1).  Twitter does not argue that its acts do not qualify as "international terrorism" under this definition — indeed, Twitter mentions this issue only in a footnote of its brief.  Therefore, we do not address it.  For purposes of this appeal, we assume, *arguendo,* that the SAC pleads properly the ATA's "international terrorism" element.

accounts and its Direct Messaging services to ISIS, and is therefore liable under § 2333(a). Twitter argues that Plaintiffs-Appellants have failed to show that they were injured "by reason of" its alleged acts, as is required for liability under that section.

The gravamen of the parties' disagreement is the scope of the ATA's "by reason of" requirement. Appropriately, the parties do not dispute that the ATA's "by reason of" language requires a showing of proximate causation. Rather, they disagree concerning what such a showing entails.[4] Plaintiffs-Appellants contend that proximate causation is established under the ATA when a defendant's "acts were a substantial factor in the sequence of responsible causation," and the injury at issue "was reasonably foreseeable or anticipated as a natural consequence." *See Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). Twitter argues that the standard is higher, requiring Plaintiffs-Appellants to show that Twitter's conduct "led directly" to their injuries. The district court declined to decide the question because it concluded that Plaintiffs-Appellants' pleading was insufficient under either standard. We conclude that Twitter has the better of the argument, and hold that to satisfy the ATA's "by reason of" requirement, a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts.

---

[4] In footnotes in their briefing, the parties suggest that there might be a second dispute regarding the issue of but-for causation. However, because this dispute was not "argued specifically and distinctly" in either party's brief, we do not address it. *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994); *see also Rodriguez v. Airborne Express*, 265 F.3d 890, 894 n.2 (9th Cir. 2001).

## A.  The ATA's "By Reason Of" Language

We undertake our construction of the ATA's "by reason of" provision against the backdrop of two key assumptions mandated by the Supreme Court:  First, we assume that Congress is familiar with the "'well established principle of the common law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause . . . and does not mean to displace it *sub silentio*' in federal causes of action."  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) (alteration omitted) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)); *see also Rothstein*, 708 F.3d at 95 ("[I]f, in creating civil liability through § 2333, Congress had intended to allow recovery upon a showing lower than proximate cause, we think it either would have so stated expressly or would at least have chosen language that had not commonly been interpreted to require proximate cause for the prior 100 years.").  Second, we assume that because Congress has used "the same words" — "by reason of" — in the ATA as it used previously in the Sherman, Clayton, and Racketeer Influenced and Corrupt Organizations (RICO) Acts, Congress intended these words to "have the same meaning that courts had already given them" in those contexts.  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).[5]

---

[5] All four statutes use near identical language to create a private right of action.  *Compare* Sherman Act, ch. 647, § 7, 26 Stat. 209, 210 (1890) (permitting "[a]ny person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act" to sue in federal court and recover treble damages and attorney's fees), *with* 15 U.S.C. § 15(a) (the Clayton Act) (permitting "any person who shall be injured in his business or

In light of these assumptions, we understand that the phrase "by reason of" connotes some degree of directness. We begin our construction of the statutory language with the Court's decision in *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992). In that case, the Court was charged with interpreting the "by reason of" language that Congress had included in the civil RICO statute. *Id.* at 265–70. To do so, the Court looked first to the history of the language as used in the Sherman and Clayton Acts, and determined that a longstanding, central element of proximate causation in the Clayton Act context was "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268. The Court reasoned that courts coalesced around this directness requirement because not requiring "some direct relation" (1) would make it more difficult to determine the amount of damages "attributable to the violation, as distinct from other, independent factors"; (2) would force courts to develop complicated damages-apportionment rules to avoid multiple recoveries; and (3) would create these difficulties needlessly, because requiring some direct relation would never prevent directly injured victims from utilizing the law. *Id.* at 268–70. The Court then held that "these reasons appl[ied] with equal force to suits" brought under the civil RICO provision, *id.* at 270, and convinced the Court to hold that civil RICO liability required a showing of "some direct relation between the injury asserted and the injurious conduct alleged," *id.* at 268.

---

property by reason of anything forbidden in the antitrust laws" to sue in federal court and recover treble damages and attorney's fees), *and* 18 U.S.C. § 1964(c) (the RICO Act) (permitting "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal court and recover treble damages and attorney's fees).

Subsequent civil RICO cases affirmed this requirement. In *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), the Court reiterated that "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 461. And in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), the Court emphasized that a claim would not meet RICO's direct relationship requirement if it required the Court to move beyond the first step in the causal chain. *Id.* at 8–12; *see also Holmes*, 503 U.S. at 271 ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step." (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)).

More recently, outside the RICO context, the Court has explored the necessity and scope of the "first step" limitation. Echoing *Holmes*'s three concerns, the Court explained in *Lexmark International* that the first-step limitation was crucial in most cases because "there ordinarily is a 'discontinuity' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct), but might instead have resulted from 'any number of [other] reasons.'" 134 S. Ct. at 1394 (alteration in original) (quoting *Anza*, 547 U.S. at 458–59). The Court observed that the general purpose of requiring proximate causation is to "bar[] suits for alleged harm that is 'too remote' from the defendant's unlawful conduct," and limit recovery to those cases where "the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 1390.

The ATA presents precisely the risks with which the Court was concerned in *Holmes* and *Lexmark*. On its face,

the ATA does not limit recovery to those directly injured. Rather, it allows "*[a]ny* national of the United States injured . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs" to sue in federal court. 18 U.S.C. § 2333(a) (emphasis added).  Thus, where an act of international terrorism causes an injury *indirectly*, there is inevitably a "discontinuity" between the injury and the defendant's conduct.  *See Lexmark Int'l*, 134 S. Ct. at 1390 (explaining injuries that are "too remote" from a defendant's unlawful conduct "ordinarily" arise where the harm for which recovery is permitted is "purely derivative of 'misfortunes visited upon a third person by the defendant's acts'" (quoting *Holmes*, 503 U.S. at 268)); *see also Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 324 (E.D.N.Y. 2015) ("The tort [that the ATA] condemns is one of secondary action, not primary action.  It assumes the existence of a tort by a third party, and then renders the defendant liable for providing support to that third party.").

Accordingly, the same three reasons that compelled the *Holmes* Court to adopt the Clayton Act's "some direct relation" requirement in the RICO context now motivate us to adopt that requirement in the context of the ATA.  As relevant here, the conduct the ATA prohibits is the provision of material support to international terrorists.  *See* 18 U.S.C. §§ 2333(a), 2339A, 2339B; *see also Bank of Am. Corp.*, 137 S. Ct. at 1305 (2017) (identifying what alleged conduct the FHA prohibited in order to analyze proximate cause). Not requiring that this provision of support have some direct relation to a plaintiff's injuries (1) would make it extremely difficult to attribute damages to the provision of material support as distinct from other intervening factors, (2) would force courts to develop complicated damages-apportionment rules to avoid multiple recoveries, and (3) would create these difficulties needlessly, because victims injured more directly

by the provision of material support would not be prevented from recovery by a "direct relation" requirement. *See Holmes*, 503 U.S. at 268–70.

## B. Plaintiffs-Appellants' Foreseeability Argument

Plaintiffs-Appellants urge us to break with *Holmes* and its progeny and adopt a different standard for proximate causation. Citing the Second Circuit's decision in *Rothstein* and the district court decision in *Linde*, Plaintiffs-Appellants argue that "[p]roximate causation is established under the ATA when a defendant's 'acts were a substantial factor in the sequence of responsible causation,' and the injury at issue 'was reasonably foreseeable or anticipated as a natural consequence.'"

Plaintiffs-Appellants' authorities are neither authoritative nor persuasive. With regard to *Rothstein*, Plaintiffs-Appellants are correct that in distinguishing the traceability requirement of Article III standing from proximate cause in that case, the Second Circuit quoted its own prior observation that

> [c]entral to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence.

708 F.3d at 91 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003), *as amended* (Apr. 16, 2003)). But the Second Circuit also quoted the Supreme Court's holding in *Anza* that with respect to "proximate causation, the central

question is whether the alleged violation led directly to the plaintiff's injuries," *id.* at 91–92 (alteration omitted) (quoting *Anza*, 547 U.S. at 461), and held that the ATA's "by reason of" language should be interpreted to require a showing of "proximate cause, as the term is ordinarily used," in the Sherman, Clayton, and RICO Act contexts, *id.* at 95. Ultimately, after considering both proximate cause standards, the *Rothstein* court found the plaintiffs had failed to plead proximate causation without ever defining precisely its understanding of the concept. *See id.* at 95–97.

Similarly, while the district court in *Linde* denied the defendant's Rule 59 challenge to a jury instruction on causation that had focused "solely on whether [the] defendant's acts were a substantial factor in causing [the] plaintiffs' injuries, and whether such injuries were a foreseeable result of those acts," the court also "instructed the jury that 'activities that are too remote, too indirect, or too attenuated are insufficient' to show proximate causation." 97 F. Supp. 3d at 328 (alteration omitted). This language comes from *Hemi Group*, in which the Supreme Court instructed that

> [p]roximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires "some direct relation between the injury asserted and the injurious conduct alleged." A link that is "too remote," "purely contingent," or "indirect" is insufficient.

559 U.S. at 9 (alteration omitted) (quoting *Holmes*, 503 U.S. at 268, 271, 274). As was the case in *Rothstein*, rather than replacing a proximate cause definition based in directness with one based in foreseeability, the *Linde* court blurred the

two concepts. Thus, at most, Plaintiffs-Appellants' cases indicate that courts in a circuit other than ours have considered foreseeability *and* directness when evaluating showings of proximate cause in cases brought under the ATA. These cases do not trump *Holmes* and its Supreme Court progeny, and they do not establish that directness is unnecessary, or that a showing of foreseeability is sufficient on its own to demonstrate proximate causation.

To be clear, we do not hold that a consideration of foreseeability is irrelevant to, or never required in, a proximate cause analysis. Proximate cause is an infamously nebulous concept that the Court has explained is meant to serve as a generic label for "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes*, 503 U.S. at 268; *see also Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) ("The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary."); *United States v. Galan*, 804 F.3d 1287, 1290 (9th Cir. 2015) ("As the Court demonstrated, the phrase 'proximate cause' hides (or encompasses) interpretive problems of its own."). We recognize that foreseeability is another of the "judicial tools" in the proximate cause toolshed. *See Hemi Grp.*, 559 U.S. at 12 ("The concepts of direct relationship and foreseeability are of course two of the 'many shapes proximate cause took at common law.'" (alteration omitted) (quoting *Holmes*, 559 U.S. at 268)).

However, for purposes of the ATA, it is a direct relationship, rather than foreseeability, that is required. "The key to the better interpretation lies in [the] statutory history." *Holmes*, 503 U.S. at 267. In the ATA, Congress chose to use the phrase "by reason of" to require a proximate cause showing, and the Court has consistently rejected arguments

that this language requires only foreseeability. *See Hemi Grp.*, 559 U.S. at 12 (affirming *Anza*'s rejection of foreseeability in favor of focus "on the directness of the relationship between the conduct and the harm"). And even in other contexts, where the Court has given foreseeability analysis more weight, the Court has still evinced a concern for the presence of some direct relationship between the defendant's acts and the injury. *See, e.g.*, *Cty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1548–49 (2017) (holding that § 1983 claim "required consideration of the 'foreseeability or the scope of the risk created by the predicate conduct,' and required the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged'" (quoting *Paroline*, 134 S. Ct. at 1719)). Thus, while it is true that "[t]he proximate-cause inquiry is not easy to define, and over the years . . . has taken various forms," we "have a great deal of experience applying it, and . . . a wealth of precedent for [us] to draw upon in doing so." *Lexmark*, 134 S. Ct. at 1390. Here, the relevant precedents analyzing the phrase "by reason of" dictate that it must require a showing of at least some direct relationship between a defendant's acts and a plaintiff's injuries.

## C.  Plaintiffs-Appellants' Fungibility Argument

In support of their alternative proximate causation definition, Plaintiffs-Appellants rely heavily on case law emphasizing the fungibility of support to terrorist organizations. For example, in *Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000), we held that "all material support" given to terrorist organizations "aids their unlawful goals." *Id.* at 1136. Focusing our attention on financial contributions in particular, we noted that there was no way to distinguish among those given to terrorist organizations for good versus for ill because (1) a donor has

no way to tell how his donation is used; (2) "even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive"; and (3) "money is fungible," such that "giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts." *Id.* And, in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court expanded on our reasoning, holding that material support "in any form" could be fungible. *Id.* at 29–36.

But these cases do not sway us to adopt Plaintiffs-Appellants' foreseeability standard. For one thing, their concern is with what constitutes "material support," not proximate causation. For another, their emphasis on the fungibility of support to terrorists only highlights the insufficiency of foreseeability alone as the standard for proximate causation in the ATA context. Indeed, the Court recently rejected a foreseeability standard of proximate causation for precisely this reason in *Bank of America Corporation v. City of Miami*, holding that in the context of the Fair Housing Act (FHA), "foreseeability alone [could] not ensure the close connection that proximate cause requires." 137 S. Ct. at 1306. The Court reasoned that because "[t]he housing market is interconnected with economic and social life," an FHA violation could "'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct." *Id.* (quoting *Associated Gen. Contractors*, 459 U.S. at 534). However, the Court found "[n]othing in the statute [to] suggest[] that Congress intended to provide a remedy wherever those ripples travel," and was troubled by the risk of "massive and complex damages litigation" that "entertaining suits to recover damages for any foreseeable result of an FHA violation"

would pose. *Id.* (quoting *Associated Gen. Contractors*, 459 U.S. at 545). Thus, the Court held that the FHA should be analogized to statutes with common law foundations, like the RICO Act, to which the Court has "repeatedly applied directness principles" and "require[d] 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes*, 503 U.S. at 268).

We reach the same conclusion. Communication services and equipment are highly interconnected in modern economic and social life, such that the provision of these services and equipment to terrorists could be expected to cause ripples of harm to flow far beyond the defendant's misconduct. Nothing in § 2333 indicates that Congress intended to provide a remedy to every person reached by these ripples; instead, Congress intentionally used the "by reason of" language to limit recovery. Moreover, we are troubled by the seemingly boundless litigation risks that would be posed by extending the ATA's bounds as far as foreseeability may reach.

We also note that even where courts have accepted a fungibility theory with regard to the provision of material support to terrorists, they have emphasized that the fact of fungibility does not relieve claimants of their burden to show causation. Accepting the fungible nature of material support does not require a court to also hold that *any* reckless contribution to a terrorist group or affiliate, no matter its attenuation, must result in civil liability. *See, e.g.*, *Rothstein*, 708 F.3d at 96 (rejecting theory that proximate cause was established per se by violation of antiterrorism law because that theory would impose strict liability inconsistent with Congress's intent in using "by reason of" language); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013) ("Although Congress clearly intended to create

impediments to terrorism by 'the imposition of liability at any point along the causal chain of terrorism,' the 'by reason of' language of the statute restricts the imposition of such liability to situations where plaintiffs plausibly allege that defendants['] actions proximately caused their injuries." (quoting S. Rep. No. 102-342, at 22 (1992)); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 522 (E.D.N.Y. 2012) (rejecting "the contention that *any* reckless contribution to a terrorist group or its affiliate, no matter how attenuated, will result in civil liability, without the demonstration of a proximate causal relationship to the plaintiff's injury").

Thus, the fact of fungibility does not modify the causal requirement imposed by the ATA's "by reason of" element. A plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts to bring a successful ATA claim.

## II. Plaintiffs-Appellants Fail to Plead Adequately Proximate Causation.

Here, Plaintiffs-Appellants have not pleaded that Twitter's provision of communication equipment to ISIS, in the form of Twitter accounts and direct messaging services, had any direct relationship with the injuries that Plaintiffs-Appellants suffered. At most, the SAC establishes that Twitter's alleged provision of material support to ISIS facilitated the organization's growth and ability to plan and execute terrorist acts. But the SAC does not articulate any connection between Twitter's provision of this aid and Plaintiffs-Appellants' injuries. Rather, as the district court noted,

> the allegations in the SAC do not support a plausible inference of proximate causation between Twitter's provision of accounts to

ISIS and the deaths of Fields and Creach. Plaintiffs allege no connection between the shooter, Abu Zaid, and Twitter. There are no facts indicating that Abu Zaid's attack was in any way impacted, helped by, or the result of ISIS's presence on the social network.

Thus, proximate causation was not shown in this case. Though we do not diminish the tragedy of the events that led to this lawsuit, we hold that Plaintiffs-Appellants have not pleaded that Twitter's provision of accounts and messaging services to ISIS had any direct relation to the injuries Plaintiffs-Appellants suffered.

## CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Plaintiffs-Appellants' SAC. Because we have decided the case based on the insufficiency of Plaintiffs-Appellants' pleading alone, we decline to reach the second question presented: whether Section 230 of Communications Decency Act of 1996 protects Twitter from liability. Plaintiffs-Appellants shall bear the costs on appeal.

AFFIRMED.